COMMONWEALTH *vs.* SHEILA BERRY.

Plymouth. February 12, 2010. - August 23, 2010.

Present: MARSHALL, C.J., SPINA, COWIN, BOTSFORD, & GANTS, JJ.

*Homicide. Practice, Criminal,* Capital case, Instructions to jury. *Insanity. Intoxication. Mental Impairment. Evidence,* Intoxication, Insanity.

Discussion of legal principles regarding lack of criminal responsibility. [612-613]

A criminal defendant convicted of murder in the first degree on a theory of extreme atrocity or cruelty was entitled to a new trial, where the instruction on lack of criminal responsibility did not adequately address the two issues presented to the jury, namely, voluntary intoxication and its impact on a mental disease or defect that, prior to the consumption of alcohol or drugs, did not reach the level of lack of criminal responsibility; and voluntary intoxication and its role in the defense of lack of criminal responsibility where a defendant's existing and active mental disease or defect reached the level of lack of criminal responsibility separate from the consumption of alcohol [613-617], and thereby created a substantial likelihood of a miscarriage of justice [618].

This court set forth a jury instruction to be used in homicide cases where there is evidence that a defendant had a mental disease or defect and consumed alcohol or drugs. [617-618]

This court addressed an issue that could arise at the retrial of an indictment charging murder in the first degree. [618-619]

INDICTMENT found and returned in the Superior Court Department on January 24, 2003.

The case was tried before *Paul E. Troy*, J.

*Eric S. Brandt*, Committee for Public Counsel Services, for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on a theory of extreme atrocity or cruelty.[1] The victim was an acquaintance. The defendant appeals from her convic-

[1]The jury did not find the defendant guilty of murder in the first degree based on deliberate premeditation.

tion, arguing that the judgment should be reversed because the judge's instruction failed to inform the jury that the defendant was not criminally responsible if her use of alcohol activated her mental illness, and the instruction was prejudicially tilted in favor of the Commonwealth; and that this court should exercise its power under G. L. c. 278, § 33E, to grant the defendant a new trial or reduce the degree of guilt to murder in the second degree in light of the overwhelming evidence of the defendant's mental disease and defect and her lack of criminal responsibility. We conclude that the instruction given to the jury created a substantial likelihood of a miscarriage of justice; accordingly, we reverse the conviction and remand the case for a new trial.

1. *Background.* The defendant had dinner with a friend on August 14, 2002. They spent about two hours together, during which time she had two to three glasses of rum. She testified that she could "feel the effects of the alcohol." She testified that, in general, alcohol "made me laugh." That evening, the defendant returned to her apartment, then went to the apartment of a friend, Deanna Marshall, with whom she had spent the afternoon. From there she walked to a small market in the neighborhood.

Three young women were standing outside the market discussing a fight one of them, Shamika DeCotis, had had with her boy friend. The defendant joined the conversation. She said she was going to blow up a train that runs under the Brockton police station, and destroy the police station as well. She credited herself for the explosions that destroyed the Federal building in Oklahoma City and the World Trade Center in New York City. In the meantime, DeCotis's boy friend, Jeffery Light, appeared and began yelling at DeCotis. The defendant told him to leave DeCotis alone. Light spit at the defendant. He pushed her into the market door and called her a "lesbian bitch." He then punched the defendant in the face.

The defendant became furious. She entered the market, swearing and muttering to herself. She grabbed two forty-ounce bottles of beer, told the clerk she would pay for them later, returned outside, and threw them at Light, who was walking away. She missed, but continued yelling and screaming. She went inside the market and started swinging a plastic market basket around and screamed at people.

Admilson Goncalves, the victim, arrived at the market. He left his bicycle outside and entered. He approached the defendant, put his arm around her, and tried to calm her, but she pushed him away. The clerk told her to leave, and he locked the door behind her. The defendant took the victim's bicycle and pedaled back to Marshall's house.

The defendant arrived at Marshall's house between 9:30 and 10 P.M. and rang the doorbell. Before Marshall answered the door, she heard the defendant and a man yelling outside her house. When Marshall went outside, she found the victim restraining the defendant, holding her arms against the side of the house. The victim told Marshall that he came for his bicycle and that the defendant had been hitting him. Marshall testified that the defendant was as upset as she had ever seen her, so she told the defendant to go into the back yard. The defendant complied, and paced around the back yard.

While the defendant was in the back yard, a car arrived at the house. The victim sat on his bicycle alongside the car and talked to the passengers. The defendant joined the group but began yelling again, getting "[l]ouder and louder," and acting in a way Marshall had never before seen. Marshall again told the defendant to go into the back yard.

Moments later, witnesses saw the defendant carrying a cinder block from the back yard down the driveway. The defendant hit the victim in the back of the head with the cinder block, and the victim lost consciousness and fell off of his bicycle into the street. The defendant continued to hit the victim in the head with the cinder block.

The defendant did not respond to any pleas to stop hitting the victim and continued striking him, making a growling sound. Witnesses testified that the defendant was "totally zoned out" and "was not hearing anything around her," "as if she was deaf to our voices." She only stopped when the cinder block broke into pieces.[2]

The defendant left Marshall's house on the victim's bicycle. When Brockton police officers arrived at her home fifteen

---

[2]The defendant denied at trial and during interviews with expert witnesses that she hit the victim with a cinder block, claiming the act was committed by Marshall and Tina Oehlschlagel, another witness.

minutes later, they heard a woman yelling inside. When the officers attempted to put handcuffs on the defendant, she continued screaming and threatened to "blow up the police station." Eventually, the officers were forced to use pepper spray to subdue her. As the officers put the defendant into the police cruiser, she fought, kicked, screamed, and continued to threaten to "blow up the police station." This behavior continued on the way to the police station and inside the station, where the defendant remained extremely agitated. It took three police officers to hold her down in order to remove her handcuffs. One officer testified that once the handcuffs were removed, he "raced for the door" because the defendant was "out of control."

The defendant was committed to Taunton State Hospital for evaluation and was twice found incompetent to stand trial, in September, 2002, and March, 2003. While at Taunton State Hospital, the defendant was unstable and became upset very easily, making threats and irrational accusations against others. She also made claims that were "clearly delusional" and was twice restrained to avoid physical confrontation. In March, 2003, the defendant was given antipsychotic and mood-stabilizing medication pursuant to a court order. She showed some improvement with the medication but continued to suffer from "agitation and paranoia." In April, 2003, a tumor on the cerebellum area of the defendant's brain was removed, and her ability to control her behavior showed "marked improvement" after the surgery. Following the removal of the tumor, the defendant was found competent to stand trial.

2. *Evidence of mental disease or defect.* The defendant set forth a defense of lack of criminal responsibility. In support of this defense, the defendant presented testimony regarding her psychiatric and neurological history and evaluations from two psychologists and three psychiatrists. The defendant's medical and psychiatric history was significant, including a head injury at the age of fourteen, several psychiatric hospitalizations beginning at the age of nineteen, substance abuse, and a tumor on her cerebellum that was discovered in 1994 and grew until it was removed in 2003. She also had a number of long-standing delusions. For example, the defendant believed that Osama Bin Laden had visited her when she was a child and that he would take retribution

if she were mistreated, which resulted in the attacks on the World Trade Center in New York City on September 11, 2001. She also believed that some singers had stolen lyrics to songs she had written and that a record company sent her a check for $643,000, but a bank teller threw the check in the trash.

The defendant called five expert witnesses, all of whom testified that the defendant suffered from bipolar disorder.[3] Three of the experts opined that the defendant also suffered from schizoaffective disorder. None of the experts suggested any "malingering," that is, fabrication or exaggeration of symptoms. Three experts opined that the defendant lacked criminal responsibility on the night of the murder as a result of her mental disease or defect. The experts based their testimony on interviews with the defendant, her mother, her grandmother, treating psychiatrists, and social workers, as well as a review of the defendant's copious medical and psychiatric records, which were not introduced in evidence.

a. *Dr. Michael Murphy.* Murphy, a forensic psychologist, was on the staff of Taunton State Hospital when the defendant was admitted. He conducted numerous evaluations, including those to determine whether the defendant was competent to stand trial. Murphy testified that the defendant suffered a traumatic brain injury after a car accident at the age of fourteen, and that the resulting lesion "continued to [a]ffect her throughout her life in terms of playing a role in her mood instability and to some degree her ability to control her behavior." He testified regarding the defendant's alcohol abuse that began around the age of sixteen, after the accident. He noted that the defendant also had a tumor in her cerebellum, discovered years earlier during a psychiatric hospitalization. The tumor grew while the defendant was at Taunton State Hospital, and in light of research showing that a tumor in the cerebellum was associated with emotional instability, Murphy began to suspect a possible relationship between the tumor and the defendant's behavior at that time. He testified that after removal of the tumor in 2003, he saw a "marked improvement in her ability to control herself and speak rationally."

---

[3]Two of the expert witnesses were witnesses employed or retained by the Commonwealth; however, the defendant called all five expert witnesses as part of her case-in-chief.

Murphy diagnosed the defendant with bipolar disorder and schizoaffective disorder, which is a disorder characterized by mood instability and elements of psychosis similar to schizophrenia. He opined that the defendant would require treatment for these conditions for her entire life.

Murphy conducted a criminal responsibility examination prior to the tumor's removal. In order to make this determination, he took into account the effects of the tumor, her antisocial personality traits, her mental illness, and the possible effects of the defendant's consumption of three glasses of rum on the night of the offense. Based on these factors, Murphy concluded that mental illness or defect did not impair the defendant's capacity to conform her conduct to the requirements of the law, and therefore she was criminally responsible at the time of the offense. After discussing the relationship between the defendant's alcohol use and her psychiatric hospitalizations, Murphy concluded that her antisocial personality traits and voluntary consumption of alcohol had an impact on her behavior at the time of the offense. After her tumor removal, he recommended a reconsideration of her criminal responsibility examination, but this did not occur. However, during cross-examination, Murphy testified that based on his observations of the defendant, he continued to believe that she was criminally responsible.

b. *Dr. Bernice Kelly.* Kelly, a psychologist employed by the Massachusetts General Hospital Law and Psychiatry Service, was engaged by defense counsel to evaluate the defendant. After multiple evaluations of the defendant, including clinical interviews, a mental status examination, neuropsychological testing to assess the defendant's cognitive functioning, and personality testing, as well as a review of the defendant's hospital records, public school records, criminal reports, and evaluations from other psychiatric experts, Kelly noted the following relevant psychiatric history: the defendant had a history of extensive psychiatric hospitalizations as a result of agitated, aggressive, and out of control behavior; she suffered from delusions and hallucinations; she displayed self-mutilating behavior; and she had a significant neurological history beginning with a head injury at the age of fourteen. Kelly noted that the defendant's behavior began to deteriorate, and she began showing signs of mental illness, after the head injury.

Kelly testified that the defendant's tumor put pressure on a ventricle in front of the cerebellum, as well as on the cisternum magnum, which is a membrane between the brain and the skull, and an area of the brain connected to behavioral control. Kelly opined that many of the defendant's behaviors prior to the removal of her tumor were a result of the brain tumor as well as her psychological illness. Kelly first conducted an examination of the defendant after her tumor was removed, and found that the change in her reported behavior and personality before the surgery and her behavior after the surgery indicated that the strongest result of the tumor on her behavior was extreme agitation, assaultiveness, and lack of control.

Kelly diagnosed the defendant with bipolar disorder with psychotic features or schizoaffective disorder, as well as posttraumatic stress disorder. Kelly testified that the defendant suffered from a number of delusional beliefs prior to the murder, including one incident where she was found shaking and incoherently mumbling to herself, claiming that she had stabbed "three white supremacists." In addition, the defendant also believed at times that she could fly. Kelly testified that, even with such a mental illness, the defendant could have some level of normal life functioning, as she did before the incident, but that she would be capable of extreme agitation and rage, as well as delusions, with little or no provocation.

Kelly determined, as a result of the defendant's mental illness and the tumor in her cerebellum, that the defendant could not have conformed her behavior to the requirements of the law and, therefore, was not criminally responsible at the time of the murder. This opinion was based on her clinical evaluation as well as incidents just prior to the murder, including the defendant's rage, delusional statements, and psychotic behaviors. She testified that, after the incident, the defendant's out-of-control behavior continued during her arrest, where, Kelly noted, "it's rare [to] see someone that agitated."

c. *Dr. Marilyn Price.* Price, a psychiatrist and clinical assistant professor at Brown University, was engaged by defense counsel to evaluate the defendant. Price, after a review of the defendant's records and interviews with the defendant, diagnosed the defendant with posttraumatic stress disorder, bipolar disorder, schizoaffective disorder, impulse control disorder, and alcohol

abuse. Price noted the defendant's delusional beliefs that continued during interviews with Price, and her psychotic behavior while incarcerated, such as telling her mother that she had $600,000 in an account only accessible by the defendant's hand print. She also discussed the defendant's earlier delusional beliefs, including reporting that she had been "gang raped," and insisting that an evaluating psychiatrist had raped her six years earlier.

When opining on whether the defendant was criminally responsible, Price stated that at the time of the killing, the defendant's bipolar disorder was in an active manic state and she was experiencing delusions. Kelly stated that the defendant was "thinking through a haze of paranoia and psychosis." While Price could not definitively say that the defendant was unable to appreciate the criminality or wrongfulness of her actions, based on the defendant's denial that she committed the murder, Price did determine that the defendant was unable to conform her actions to the requirements of the law at the time of the murder. Price based this conclusion on behavior that others observed, as well as the defendant's clinical history. Price stated that at the time of the murder, the defendant was mentally ill, was psychotic, had a cerebellar brain tumor, and had residual effects of head trauma that disinhibited her behavior, all of which led her to be agitated and out of control at the neighborhood market, in front of Marshall's house, during her arrest, and then for seven months following her arrest at Taunton State Hospital. The defendant remained in this condition until she was forced to take antipsychotic medication and had surgery to remove the brain tumor. Price added that, while the victim did not seem to be incorporated into the defendant's delusions before the murder, his efforts to calm the defendant could have led to an escalation of her psychotic behaviors instead of calming her down. Price also testified that the defendant's inability to control her conduct was also shown by the extreme violence of the attack itself, as well as the fact that it was not "rational," noting that "nothing that this victim did . . . should have provoked [that] kind of reaction."

d. *Dr. Malcolm Rogers.* Rogers, a psychiatrist with Brigham and Women's Hospital, was originally retained as a witness for the Commonwealth. He reviewed numerous records, interviewed the defendant, and conducted a mental status examination and cerebellar testing. After his initial examination, he believed that

the defendant's conduct was caused by voluntary substance use, separate from any mental illness. However, he later became aware of information he previously had overlooked and realized that while some of her behavior was induced by intoxication, she continued to exhibit manic and hypomanic behavior after she became sober. Rogers also noted the changes in the defendant after the cerebellar tumor was removed, as she became less hostile, anxious, and aggressive. He credited the cerebellar tumor, in conjunction with bipolar disorder, with contributing to the defendant's emotional instability, aggressiveness, pressured speech, odd and extreme ideas, and distortions of reality.

Rogers concluded that the defendant was not criminally responsible, as a result of her major mental disorder. While she did retain the capacity to appreciate the wrongfulness of her actions, she lacked the substantial capacity to conform her behavior to the requirements of the law at the time of the murder. In arriving at this conclusion, he spoke with Marshall, who discussed the defendant's delusions and prior aggression. Rogers stated, "[I]t may well be true that the alcohol had some disinhibiting [e]ffect on the night of the incident because it usually does, and it had with her before often been associated with aggressive behaviors. But it was — for me, it was really the continuation of hypomanic symptoms when she was in the hospital, on other occasions, and after this incident when she was in Taunton State Hospital, there were many indicators, I thought, of hypomanic symptoms that continued in the absence of substance abuse."

e. *Dr. Russell Vasile.* Vasile, a psychiatrist at Beth Israel Deaconess Medical Center, was retained by the Commonwealth (after Rogers found the defendant not criminally responsible). Vasile opined that, while the defendant suffered from bipolar disorder, she was not in an active manic state on the night of the incident and was therefore criminally responsible.

Vasile discussed the defendant's various hospitalizations, stating that they were "not uncommonly influenced or complicated by substance use." He stated that the defendant had a manic quality, but her use of alcohol and marijuana was a critical factor in destabilizing her behavior, a theme that was repeated many times in the defendant's history. He opined that, on the night of the murder, the defendant had possession of her rational faculties, had no delusional psychosis or delusions influencing

her behavior toward the victim, and displayed elements of impulse control, in that the initial altercation at the market involved a disengagement of aggressive behavior. He also stated that the defendant's retreat to the back of Marshall's house to pick up a cinder block showed that there was a quality of planning and malevolent intent towards the victim. Vasile testified that the defendant's conduct was "triggered" that night because "she is particularly vulnerable to alcohol."

Vasile discounted research regarding the impact of cerebellar tumors on behavior and stated that he believed the tumor's impact was insignificant to minimal, given the other overwhelming factors in the defendant's case.

3. *Discussion.* The defendant argues that the judgment must be reversed because the jury instructions failed to inform the jury that the defendant was not criminally responsible if her use of alcohol activated her mental illness, and the instruction given did not give a balanced picture of the governing law. The judge's instruction at issue, which mirrors the Model Jury Instructions on Homicide 52-53 (1999), stated:

> "Lack of criminal responsibility is not present when a defendant with a mental disease or defect knows, or, in the circumstances has reason to know, that [her] consumption of a substance will cause [her] to be substantially incapable of either appreciating the wrongfulness of [her] conduct or conforming [her] conduct to the requirement of the law (or both). In deciding what the defendant had reason to know about the consequences of [her] consumption of a substance, you should consider the question solely from the defendant's point of view, including [her] mental capacity."

The issue in this case is whether the model instruction concerning the combination of a mental disease or defect and the voluntary consumption of alcohol or drugs is in accordance with the case law and, if it was not, whether the instruction created a substantial likelihood of a miscarriage of justice, as the defendant did not object to the instruction at trial.[4] See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

---

[4]This instruction was most recently considered by this court in *Com-*

a. *Basic legal principles regarding lack of criminal responsibility.* The modern test for criminal responsibility was established in *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967). *McHoul* held that once a defendant raises the issue of criminal responsibility,[5] the Commonwealth has the burden to prove, beyond a reasonable doubt, that the defendant did not lack the substantial capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law, as a result of a mental disease or defect. *Id.* See *Commonwealth* v. *Angelone,* 413 Mass. 82, 84 (1992). In order to prove that a defendant can "conform [her] conduct to the requirements of the law," the prosecution must show that the defendant had a "substantial ability to behave as the law requires; that is, to obey the law."[6] Model Jury Instructions on Homicide, *supra* at 52. The judge's correct instruction on the basic elements of lack of criminal responsibility is not at issue here.

The standard set forth in *Commonwealth* v. *McHoul, supra,* requires that there be a causal connection between the defendant's mental disease or defect and the substantial incapacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law. Under a separate line of cases, voluntary intoxication, standing alone, does not provide a basis for a claim of lack of criminal responsibility. See *Commonwealth* v. *Sheehan,* 376 Mass. 765, 770-771 (1978); *Commonwealth* v. *Farrell,* 322 Mass. 606, 621 (1948). Where these two lines of cases overlap, this court has said if the jury find that the "defendant had a *latent mental disease or defect* which caused the defendant to lose the capacity . . . to conform his

*monwealth* v. *Whitman,* 453 Mass. 331, 348-351 (2009); however, the defendant had not contested the language of this instruction, but instead appealed based on the necessity for further instructions on the "activation" theory and the language of a secondary instruction regarding the voluntary consumption of alcohol or drugs by the defendant.

[5] The defense of lack of criminal responsibility "may be raised properly by the admission of any evidence which, if believed, might create a reasonable doubt concerning the defendant's criminal responsibility at the time of the [crime]." *Commonwealth* v. *Mills,* 400 Mass. 626, 627 (1987), quoting *Commonwealth* v. *Laliberty,* 373 Mass. 238, 246-247 (1977).

[6] The defendant did not argue that the first prong of the *McHoul* test applied, that is, that the defendant lacked the substantial capacity to appreciate the criminality or wrongfulness of her conduct. *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967).

conduct to the requirements of the law, lack of criminal responsibility is established even if voluntary consumption of alcohol activated the illness," as long as the defendant did not know or have reason to know that the activation would occur (emphasis added). *Commonwealth* v. *Brennan*, 399 Mass. 358, 363 (1987). See *Commonwealth* v. *Angelone*, *supra* at 85. "[L]atent" is defined as "[c]oncealed; dormant" or "existing in hidden, dormant, or repressed form but [usually] capable of being evoked, expressed, or brought to light." Black's Law Dictionary 961 (9th ed. 2009). Webster's Third New Int'l Dictionary 1275 (1993).

b. *Analysis of instruction.* The instruction given by the judge in this case derives from these two lines of cases addressing the relationship between the voluntary consumption of alcohol or drugs and a claim of lack of criminal responsibility. However, as applied to this case, the model instruction is not clear and did not properly instruct the jurors. *Commonwealth* v. *Batchelder*, 407 Mass. 752, 759 (1990), quoting *Commonwealth* v. *Richards*, 384 Mass. 396, 399-400 (1981), and *Commonwealth* v. *Nieves*, 394 Mass. 355, 360 (1985) ("In assessing the sufficiency of the jury instructions, we consider the charge in its entirety, to determine the 'probable impact, appraised realistically . . . upon the jury's factfinding function.' . . . '[W]hether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction[s]' ").

The jury instructions used in this case were derived from *Commonwealth* v. *McGrath*, 358 Mass. 314 (1970); *Commonwealth* v. *Shelley*, 381 Mass. 340, 350 (1980); and *Commonwealth* v. *Herd*, 413 Mass. 834, 841 (1992). The *McGrath* instruction[7] limited the jury's analysis to circumstances where a defendant had an underlying mental disease or illness but,

---

[7]"I instruct you that if you find that [the defendant] had an underlying mental disease or illness *but that despite such underlying mental disease he had the substantial capacity to appreciate the wrongfulness (criminality) of his conduct and had the substantial capacity to conform his conduct to the requirements of the law,* and if you further find that, by reason of and because of his voluntary use of drugs or drugs and alcohol on the day of the crimes or the few days before the crimes, he lost his substantial capacity to appreciate the criminality of his conduct or substantial capacity to conform his conduct to the requirements of law . . . ." *Commonwealth* v. *McGrath*, 358 Mass. 314, 320 (1970).

despite that mental disease or illness, retained the capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law, until voluntarily consuming alcohol. See *Commonwealth* v. *Brennan*, 399 Mass. 358, 363 (1987) ("The *McGrath* instruction describes a case where the *intoxication*, not the disease or defect, is the cause of the defendant's lack of criminal responsibility").

The *McGrath* instruction did not address the situation where voluntary consumption of alcohol or drugs unforeseeably activated a latent mental disease or defect, leading to the principle first set forth in *Commonwealth* v. *Brennan, supra* at 363, and *Commonwealth* v. *Shelley, supra* at 350, and clarified in *Commonwealth* v. *Herd, supra* at 839, quoting *Commonwealth* v. *Brennan, supra*:

> "If voluntary consumption of a drug activated a latent mental disease or defect and, as a result of that mental disease or defect, the defendant lost the substantial capacity to understand the wrongfulness of his conduct or to conform his conduct to the requirements of the law, lack of criminal responsibility would be established, unless the defendant 'knew or had reason to know that the [drug] would activate the illness.' "

This court emphasized in the *Herd* case that the main issue is not whether the defendant knew he had a mental illness, but whether he knew that his intoxication caused or might cause him to become violent. *Commonwealth* v. *Herd, supra* at 842. Similarly, in another case decided shortly before the *Herd* case that involved the impact of voluntary consumption of drugs on the onset of epileptic seizures, this court concluded that an activation instruction was necessary, holding that "[t]here was a real danger that the jury would assume that the principles of the *McHoul* case do not apply to a person whose mental disease or defect was triggered *or aggravated* by his voluntary consumption of drugs" (emphasis added). *Commonwealth* v. *Angelone, supra* at 88.

The model instruction, which was adopted in 1999, accommodates both the situation presented in the *McGrath* case and the situation presented in the *Shelley* and *Herd* cases, that is, (1) where the defendant, despite having a mental disease or

defect, continued to have the substantial capacity to appreciate the wrongfulness of her actions or conform her conduct to the requirements of the law, until the consumption of alcohol or drugs resulted in the lack of a substantial capacity; and (2) where voluntary consumption of alcohol or drugs unforeseeably activated a latent mental disease or defect. The case before us presents yet a third set of circumstances not contemplated by the model instruction.

In this case, all five experts testified that the defendant was suffering from bipolar disorder at the time of the murder, and three of the experts opined that the defendant also suffered from schizoaffective disorder. One expert explicitly cited alcohol as a main contributor to the defendant's actions. The experts were split in their assessments of the defendant's criminal responsibility. The import is that no expert testified the defendant suffered from a *latent* mental illness that was activated by the consumption of alcohol.

Accordingly, if any instruction was to be given on the matter, the instruction must have made clear to the jury the law on two issues: (1) voluntary intoxication and its impact on a mental disease or defect that, prior to the consumption of alcohol or drugs, did not reach the level of lack of criminal responsibility (the model [*McGrath*] instruction), and (2) voluntary intoxication and its role in the defense of lack of criminal responsibility where a defendant's existing and *active* mental disease or defect reached the level of lack of criminal responsibility separate from the consumption of alcohol. The model instruction given does not cover the second scenario. Under this instruction, the jury could have believed that, even if they first determined that the defendant's mental disease or defect, separate from the voluntary consumption of alcohol, caused her to lose a substantial capacity to conform her conduct to the requirements of the law, any alcohol that exacerbated her conduct would result in the forfeiture of the defense of lack of criminal responsibility.

Because the model instruction does not apply to the scenario presented in this case, the defendant is entitled to a new trial, with instructions that adequately clarify the two issues presented to the jury. Evidence was presented suggesting *not only* that the defendant had an *active* mental disease or defect at the time of

the crime that the jury could have determined caused the defendant to lack the substantial capacity to appreciate the wrongfulness of her actions or conform her conduct to the requirements of the law, *but also* that the defendant had voluntarily consumed alcohol or drugs that aggravated her lack of substantial capacity. Where only the model instruction was given, the jury could have believed that, even where a defendant lacked the substantial capacity to conform her conduct to the law as a result of her mental disease or defect, that defense would be defeated by the voluntary consumption of any alcohol that exacerbated her condition.

The United States Court of Appeals in *United States* v. *Garcia*, 94 F.3d 57 (2d Cir. 1996), and in *United States* v. *Knott*, 894 F.2d 1119 (9th Cir. 1990), addressed this issue, both approving a jury instruction that stated, in part, that "if you find that at the time in issue the Defendant had a severe mental disease or defect, and that the disease or defect gave rise to an inability to appreciate the nature or quality or wrongfulness of his acts, then the Defendant's consumption of drugs or alcohol, whether voluntary or involuntary, cannot preclude his defense of insanity." *United States* v. *Garcia, supra* at 60. See *United States* v. *Knott, supra* at 1123. These cases established that "voluntary substance abuse must not be taken into account in determining whether a severe mental disease or defect exists in the first instance, but where such a disease or defect is found to exist, voluntary substance abuse will not defeat an insanity defense."[8] *United States* v. *Garcia, supra* at 61. In addition, the commentary to the Model Penal Code emphasizes this point — that a defense of lack of criminal responsibility is not defeated where the defendant also consumed alcohol or drugs, as long as the mental disease or defect was the cause of the lack of criminal

---

[8]Federal law, as a result of the Insanity Defense Reform Act of 1984, does not recognize lack of criminal responsibility where a defendant's inability to appreciate the nature and quality of his acts is caused in part by a mental disease or defect and in part by voluntary intoxication. *United States* v. *Garcia*, 94 F.3d 57, 61-62 (2d Cir. 1996). Massachusetts does recognize such a theory, in the context of the activation of a latent mental illness. See *Commonwealth* v. *Herd*, 413 Mass. 834, 841 (1992); *Commonwealth* v. *Shelley*, 381 Mass. 340, 350 (1980). Despite the defendant's argument on appeal to the contrary, there is no evidence supporting the activation of a latent mental illness in this case.

responsibility. American Law Institute, Model Penal Code and Commentaries § 2.08 comment 2, at 361 (1985) ("Certainly one who lacks the capacity described in Section 4.01[1] [to appreciate wrongfulness of his actions or conform his conduct to the requirement of the law] because of mental disease ought not to be limited in the presentation of his defense simply because he is intoxicated as well as insane at the time of acting").

Accordingly, we set forth an appropriate instruction that may be used in this case and in future homicide cases as warranted where there is evidence that a defendant had a mental disease or defect *and* consumed drugs or alcohol:

> "A defendant's lack of criminal responsibility cannot be solely the product of intoxication caused by her voluntary consumption of alcohol or another drug. [*Commonwealth* v. *Sheehan*, 376 Mass. 765, 770 (1978).]
>
> "However, a defendant is not criminally responsible if you have a reasonable doubt as to whether, when the crime was committed, the defendant had a latent mental disease or defect that became activated by the voluntary consumption of drugs or alcohol, or an active mental disease or defect that became intensified by the voluntary consumption of drugs or alcohol, which activated or intensified mental disease or defect then caused her to lose the substantial capacity to appreciate the wrongfulness of her conduct or the substantial capacity to conform her conduct to the requirements of the law. If you have a reasonable doubt as to whether the defendant was criminally responsible, you shall find the defendant not guilty by reason of lack of criminal responsibility.[9] [*Commonwealth* v. *Herd*,

---

[9]Where the Commonwealth offers evidence that the defendant knew or had reason to know of the effects of drugs or alcohol on her latent mental disease or defect, or on the intensification of her active mental disease or defect, the following instruction must be added:

> "However, if the Commonwealth has proved beyond a reasonable doubt that the defendant consumed drugs or alcohol knowing or having reason to know that the drugs or alcohol would activate a latent mental disease or intensify an active mental disease, causing her to lose the substantial capacity to appreciate the wrongfulness of her conduct or the substantial capacity to conform her conduct to the requirements of the law, then you would be warranted in finding the defendant criminally

413 Mass. 834, 841 (1992). *Commonwealth* v. *McGrath,* 358 Mass. 314 (1970).]

"Where a defendant has an active mental disease or defect that caused her to lose the substantial capacity to appreciate the wrongfulness of her conduct or the substantial capacity to conform her conduct to the requirements of the law, the defendant's consumption of alcohol or another drug cannot preclude the defense of lack of criminal responsibility."

c. *Substantial likelihood analysis.* We review this matter under the standard of a substantial likelihood of a miscarriage of justice, as it was not preserved at trial. *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992). In analyzing a claim under the substantial likelihood standard, we review the evidence and case as a whole and consider whether any error made in the course of the trial was likely to have influenced the jury's conclusion. *Id.*

Here, the instruction given to the jury was not clear as to its application. In the context of the entire trial, the jury could have concluded that the defendant suffered from a mental disease or defect that by itself rendered her substantially incapable of conforming her conduct to the requirements of the law, but because she had consumed alcohol that contributed to her incapacity, that would render the lack of criminal responsibility defense moot. Accordingly, the instruction created a substantial likelihood of a miscarriage of justice.

4. *Issue on remand.* The defendant briefly addresses on appeal the lack of evidence submitted to the jury regarding the defendant's knowledge of the potential impact of alcohol on her mental disease or defect, and whether the instruction on the consumption of alcohol should have been given. This is an issue likely to arise at retrial.

The matter of the defendant's knowledge of the effects of alcohol must be considered "solely from the defendant's point of view, taking into account [her] mental condition," that is, by

responsible for a crime in which you find she knowingly participated. In deciding what the defendant had reason to know about the consequences of her consumption of drugs or alcohol, you should consider the question solely from the defendant's point of view, including her mental capacity and her past experience with drugs or alcohol."

applying a subjective test. *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 (1998). Here, the experts concurred that she suffered from bipolar disorder, and the defendant testified that she was not taking her antipsychotic medications at the time of this incident. Her knowledge, whatever it may have been, must be considered in light of her mental illness.

The Commonwealth had the burden to prove the defendant's knowledge beyond a reasonable doubt. *Commonwealth* v. *Herd*, 413 Mass. 834, 841-842 (1992). The Commonwealth did not make any argument during closing argument or in its appellate brief suggesting that the defendant had any knowledge or reason to know about the effects of alcohol on her mental illness. The only direct evidence presented to the jury concerning what the defendant knew or should have known about the impact of alcohol on her behavior was the defendant's own testimony. The defendant stated that alcohol "made me laugh." This statement does not indicate that the defendant had any knowledge that the consumption of alcohol would lead to violent behavior. While expert testimony was presented that there was a connection between the defendant's drinking and her various psychiatric hospitalizations, there was no testimony that she knew of such a connection and no psychiatric records were submitted to the jury that provided a basis for such a conclusion. Accordingly, while the experts could rely on those records in formulating their opinions, none of the information in the records was available to the jury to assess whether the defendant had reason to know that her consumption would result in a loss of her substantial ability to conform her conduct to the requirements of the law. Finally, the defendant testified that alcohol did not contribute to her psychiatric hospitalizations.

In the case as tried, there was no evidence that the defendant knew or should have known of the effects of alcohol on her mental illness. Consequently, the instruction on the effects of alcohol on mental illness should not have been given.

5. *Conclusion.* For the foregoing reasons, the defendant's conviction of murder in the first degree is reversed, and the case is remanded for a new trial in accordance with this opinion.

*So ordered.*