COMMONWEALTH *vs.* ALFREDO RIVERA.

No. 10-P-1314.

Hampden. November 3, 2011. - December 3, 2012.

Present: GREEN, SIKORA, & WOLOHOJIAN, JJ.

*Armed Assault with Intent to Murder. Assault and Battery by Means of a Dangerous Weapon. Assault and Battery on Certain Public Officers and Employees. Insanity. Intoxication. Mental Impairment. Practice, Criminal,* Instructions to jury, Retroactivity of judicial holding. *Evidence,* Insanity, Intoxication, Prior misconduct.

A criminal defendant convicted of armed assault with intent to murder, assault and battery by means of a dangerous weapon, and assault and battery on a police officer was entitled to a new trial, where the instruction on lack of criminal responsibility did not expressly inform the jury that the defendant's mental disease or defect, solely and independently of the consumption of alcohol or drugs, may deprive him of the substantial capacity to appreciate wrongfulness or to conform his conduct to the law, as required by a revised model instruction announced in decisions of the Supreme Judicial Court subsequent to the trial's completion but during the pendency of direct appellate review; and where criminal responsibility was the central issue at trial and there was abundant evidence of the defendant's long-standing mental illness. [844-848]

Discussion of issues that may arise, during a retrial of indictments, concerning the admissibility of a prior verdict in the District Court finding the defendant not guilty of a criminal charge by reason of insanity [848-849], and the inclusion in the model instruction on criminal responsibility of the element of the defendant's subjective knowledge of the potential effect of alcohol consumption on the symptoms of his mental illness [850].

INDICTMENTS found and returned in the Superior Court Department on October 17, 2007.

The cases were tried before *C. Jeffrey Kinder,* J.

*Cathryn A. Neaves* for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

SIKORA, J. A Superior Court jury found the defendant, Alfredo

Rivera, guilty on one count of armed assault with intent to murder, G. L. c. 265, § 18(*b*); one count of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A(*c*)(I); and one count of assault and battery on a police officer, G. L. c. 265, § 13D. His trial presented the issue of criminal responsibility. Evidence indicated that he suffered from a controllable mental illness. Evidence indicated also that at the time of the charged offenses he had voluntarily consumed alcohol and thereby activated the illness. The trial judge delivered the then model jury instructions upon the question of criminal responsibility in those circumstances. On appeal the defendant argues that an expanded model instruction announced by the Supreme Judicial Court in decisions after his trial governs his case. We conclude that the subsequent instructions are applicable. We therefore reverse the convictions and remand the case.

*Background.* 1. *The crime.* The jury received the following evidence. On July 5, 2007, police Officer Wilfredo Guzman was working his usual patrol in Holyoke in a marked cruiser. His route included the Lyman Terrace housing project (housing project) in which the defendant resided. Officer Guzman and the defendant had met before; Guzman described their exchanges as friendly. However, several weeks before, on June 23, Guzman and Officer Gary Gresh had encountered the defendant at the housing project. At the time, the defendant was drinking a beer and spoke to Guzman in Spanish. He seemed restless and appeared to be angry. After the encounter, Gresh, who did not speak Spanish, mentioned to Guzman that the defendant seemed upset with Guzman. Guzman told Gresh that the defendant had said, "Smile now because I'm going to get you in a couple days." Guzman also told Gresh, "The guy's nuts. He's off his meds, been drinking for four or five days now." In addition, Guzman recalled that shortly before July 5, 2007, he again saw the defendant, who seemed agitated, called the police "demons," and referred to himself as "the Messiah."

On July 5, 2007, around 7:00 P.M., Guzman and his partner drove to the scene of a sudden death elsewhere in Holyoke. Guzman dropped his partner off and then drove to the housing project alone. Witnesses saw the defendant approach the cruiser and speak with Guzman. The defendant then went to his apart-

ment, returned to the cruiser with what witnesses described as a stick or a bat,[1] and hit Guzman. Before the blow, witnesses heard the defendant say, "You want some of this."

After the attack, the cruiser sped forward and crashed into a nearby building. The defendant continued to stand in the stairway to his apartment. Witnesses heard him say, "The next time I'll do it with a gun. Don't mess with me," and "I killed him. I killed him. I'm a warrior. I'm a warrior."

When the police arrived at the scene, witnesses directed them to the defendant, who continued to stand on the stoop. At this point, he was holding a machete and a beer can. Two officers drew their guns and told the defendant to drop the machete. The defendant walked calmly down the stairs with the machete in hand. When a third officer approached and commanded him to drop the machete, he finally did. The officers then forced him to the ground, handcuffed him, and placed him in a cruiser. During transport to the police station, the defendant asked whether Guzman was dead and said that it was "personal" between them.

At the station, the defendant behaved erratically. He spoke of the end of the world, and described himself as the devil and the police officers as demons. He stated, "He [Guzman] knew I was going to do it. . . . I told him because it was personal." He related that Guzman had teased him about a sexual relationship with an older woman in the neighborhood. He said that Guzman had taunted him and that he had responded that he was not a sucker, that he was Jehovah's angel, and that he was not afraid.

Officer Guzman suffered severe, career-ending injuries. His upper and lower jaw were broken and his teeth were fractured or lost; he lost vision in his left eye. He sustained permanent memory loss; he retained no memory of the details of the attack. Additionally, Guzman experienced residual emotional effects, including insomnia, violent dreams, and ongoing feelings of irritability and anger.

2. *The defendant's mental health history.* Abundant testimony and documentation addressed the defendant's history of mental

---

[1]After the attack the police found a sledgehammer in the cruiser.

illness. He suffered from paranoid schizophrenia, characterized by delusions and hallucinations. He took medications; they did not entirely eliminate the symptoms. The illness was permanent. Paranoid schizophrenics may stop their medications for various reasons, including delusions of poisoning.

A psychiatrist and psychotherapist followed his treatment. A caseworker from the Department of Mental Health (DMH) monitored his progress. A direct care counselor from the Community Support Program (CSP) assisted him with transportation, finances, and household maintenance. She testified that he had become increasingly paranoid in April of 2007, and suspected that he was not taking his medications.

The defendant had undergone numerous hospitalizations. In 2003, he had barricaded himself in his apartment and had threatened police officers with a machete. He asked the police to shoot him. At the hospital, he reported the belief that the Federal government was pursuing him. His evaluation described him as paranoid, delusional, and depressed. He underwent another hospitalization one month later; he had telephoned his mental health providers and threatened to blow up his apartment. He experienced a third hospitalization in 2005; he had stopped taking his medication and had threatened his neighbors with violence.

The defendant had experienced previous contacts with Holyoke police personnel. In 2002, he had threatened housing authority officials in the belief that they were conspiring against him. The incident resulted in a police chase at the end of which he had swung a bat at officers and asked them to shoot him. Also during that year, District of Columbia police reported telephone calls and threats from the defendant. When Holyoke police interviewed him, he related that he was making an appointment to meet with President Bush.

The defendant's mother died in February, 2007. His therapist, DMH caseworker, and CSP counselor all testified that he suffered from "decompensation" after her death, i.e., an increase in symptoms of schizophrenia, including heightened paranoia. The jury heard evidence that the defendant stopped taking his medications after his mother's death and began drinking alcohol. His mental health providers observed an increase in paranoid

delusions. He experienced another hospitalization in April of 2007, three months before the attack on Guzman.

3. *Expert testimony.* Psychologist Barry J. Nigrosh performed the initial court-ordered assessment of the defendant's competency to stand trial, pursuant to G. L. c. 123, § 15(*a*). He had previously evaluated the defendant's criminal responsibility in 2002. He interviewed the defendant on the day after the attack, studied the police report, and spoke with the DMH caseworker. He concluded that the defendant continued to suffer from paranoid schizophrenia, doubted his competence to stand trial, and recommended extended evaluation at Bridgewater State Hospital (Bridgewater).

The defendant called psychologist Elizabeth Wollheim. She had performed the assessment of the defendant's competence at Bridgewater in accordance with G. L. c. 123, § 15(*a*).[2] She observed symptoms of paranoid schizophrenia such as delusional beliefs and auditory hallucinations, but found him competent to stand trial. She could not opine whether the defendant could appreciate the wrongfulness of his conduct, but did conclude that his illness made him unable to conform his conduct to the requirements of the law. She acknowledged that alcohol consumption could have lessened his inhibitions and "amplified" his symptoms.

The defendant called also psychologist Michael Sherry. He had examined the defendant's history[3] and interviewed him in 2008 on four occasions for a total of seven hours. He opined

---

[2]Dr. Wollheim examined Dr. Nigrosh's § 15(*a*) report, police incident reports, earlier evaluations from 2002 and 2004, and the defendant's DMH records. She consulted the defendant's DMH caseworker and his treatment team at Bridgewater. She then interviewed him in late July of 2007 and again thereafter. (The record does not disclose the number of interviews and dates.)

[3]Doctor Sherry examined the defendant's prior criminal responsibility and competency documents, including hospitalization records, Dr. Nigrosh's § 15(*a*) report, the police reports of the attack on Officer Guzman, and the defendant's DMH records. He interviewed the defendant's therapist and DMH staff.

The defendant called all three expert witnesses. The prosecutor vigorously cross-examined them. The Commonwealth may prove that a defendant is criminally responsible without presentation of expert opinion. See *Commonwealth* v. *Shelley,* 381 Mass. 340, 347 (1980); *Commonwealth* v. *Rasmusen,* 444 Mass. 657, 663 (2005).

that the defendant's mental health had deteriorated over time so that at the time of the charged attack his illness deprived him of a substantial capacity both to appreciate the wrongfulness of his actions and to conform his behavior in accordance with the law. He too acknowledged that alcohol consumption could have lessened the defendant's inhibitions against violent behavior.

4. *Trial and disposition.* Trial proceeded for seven days during May of 2009. After the return of the three guilty verdicts, the judge committed the defendant to Bridgewater for forty days in accordance with G. L. c. 123, § 15(*e*), for observation and examination in aid of sentencing; and then for additional time, in accordance with G. L. c. 123, § 18(*a*), for continuing examination at the proposal of Bridgewater's staff. The judge imposed three sentences: (1) on the conviction of armed assault with intent to murder, a term of from twelve to fifteen years in State prison; (2) on the conviction of assault and battery by means of a dangerous weapon, a probationary period of ten years from and after his release from State prison; and (3) on the conviction of assault and battery on a police officer, a term of two and one-half years in a house of correction to run concurrently with the State prison term. This appeal has followed.

*Analysis.* 1. *Instruction upon the interaction of mental illness and voluntary consumption of alcohol.* The defendant challenges the judge's instruction upon criminal responsibility as inadequate and likely to have misled the jury. The judge delivered the instructions approved as of the time of trial in May of 2009. First, in accordance with *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967), he explained that "[a] person is not criminally responsible for his . . . conduct if he suffers from a mental disease or defect, and as a result of that mental disease or defect he lacks substantial capacity either to appreciate the criminality or wrongfulness of his conduct or to conform his conduct to the requirements of law." He emphasized that the Commonwealth retained the burden of proving beyond a reasonable doubt both the substantial capacity to appreciate criminality or wrongfulness and the substantial capacity to conform one's behavior.

The judge then drew upon the Model Jury Instructions on Homicide 51-52 (1999) to explain the law governing cases

presenting evidence of a defendant's mental illness and his voluntary consumption of alcohol or drugs.[4] He stated preliminarily that intoxication caused by the voluntary consumption of alcohol or drugs cannot be a basis for concluding that the defendant lacked criminal responsibility; and that alcoholism or drug addiction is not a mental disease or defect within the meaning of the test for lack of criminal responsibility. He went on to state:

> "However, if the defendant suffers from a mental disease or defect that is activated by the consumption of alcohol or drugs and that results in the lack of a substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, then the defendant is not criminally responsible.

> "If the Commonwealth proves beyond a reasonable doubt that the defendant knew or subjectively had reason to know that consumption of alcohol or drugs would trigger the underlying mental disease or defect, then the defendant does not lack criminal responsibility due to the alcohol or drugs activation theory.

> "In determining whether the defendant had knowledge of the effect of his consumption of alcohol or drugs, you may consider whether the defendant's mental condition might have interfered with his ability to understand what a normal person in the same situation would have reasonably understood."

In two decisions since the defendant's trial, the Supreme Judicial Court has found the substance of this model instruction inadequate because it does not expressly inform the jury that the defendant's mental disease or defect, solely and independently of the consumption of alcohol or drugs, may deprive him of the substantial capacity to appreciate wrongfulness or to conform his conduct to the law. See *Commonwealth* v. *Berry*, 457 Mass.

---

[4]The model instructions, in turn, result primarily from the cases of *Commonwealth* v. *McGrath*, 358 Mass. 314, 319-320 (1970); *Commonwealth* v. *Shelley*, 381 Mass. 340, 350 (1980); *Commonwealth* v. *Brennan*, 399 Mass. 358, 363 (1987); and *Commonwealth* v. *Herd*, 413 Mass. 834, 841 (1992).

602, 616-618 (2010)[5] (released fifteen months after the trial); *Commonwealth* v. *DiPadova*, 460 Mass. 424, 431-435 (2011)[6] (released twenty-seven months after the trial). In both instances, the court reversed convictions of murder in the first degree and remanded for new trials in accordance with enlarged instructions informing the jury of the possible ground of criminal irresponsibility by reason of a defendant's mental disease or defect independent of the consumption of alcohol or drugs. See *Commonwealth* v. *Berry*, *supra* at 617-618; *Commonwealth* v. *DiPadova*, *supra* at 438, 439-440 (revised model instruction).[7]

2. *Application of the subsequent decisions to this case.* No

---

[5]The decisive passages of the *Berry* decision include the following: "Where only the model instruction was given, the jury could have believed that, even where a defendant lacked the substantial capacity to conform [his] conduct to the law as a result of [his] mental disease or defect, that defense would be defeated by the voluntary consumption of any alcohol that exacerbated [his] condition." 457 Mass. at 616.

The court added an incisive quotation from the American Law Institute, Model Penal Code and Commentaries § 208 comment 2, at 361 (1985): "Certainly one who lacks the capacity . . . [to appreciate wrongfulness of his actions or conform his conduct to the requirement of the law] because of mental disease ought not to be limited in the presentation of his defense simply because he is intoxicated as well as insane at the time of acting." *Berry*, *supra* at 617.

[6]In *DiPadova*, the court made the point in the following language:

"Conversely, where a defendant's mental disease or defect, by itself, causes a lack of substantial capacity, the defendant's consumption of alcohol or drugs does not lead to forfeiture of an otherwise valid defense of lack of criminal responsibility. This is true even where that consumption or intoxication may exacerbate or aggravate the symptoms of the mental condition, and even where the defendant knows such aggravation may result, *so long as the defendant already lacked criminal responsibility absent the effects of the substances*" (emphasis supplied).

460 Mass. at 431-432.

[7]The expanded, revised *Berry* instruction recommended by the court in *DiPadova* includes the following provision:

"You must also keep in mind that . . . where a defendant, at the time the crime is committed, has a mental disease or defect that *itself* causes him to lack the substantial capacity [to appreciate the wrongfulness of his conduct or to conform his conduct to the law,] he is not criminally responsible for his conduct regardless of whether he uses or does not use alcohol or drugs. That is true even if he does use alcohol or drugs and the alcohol or drug use makes the symptoms of his mental

principled distinction separates our case from the reasoning and result of the *Berry* and *DiPadova* decisions. In those instances the court reviewed convictions of murder in the first degree under the authority of G. L. c. 278, § 33E, as amended by St. 1979, c. 346, § 2 ("consideration of the law and the evidence" and "any other reason that justice may require"). Our case includes grave crimes and a lengthy prison sentence. In those cases, deference for the prevalent model instruction caused trial defense counsel to forgo objection and preservation of the appellate issue. Consequently the Supreme Judicial Court reviewed the instructions for "a substantial likelihood of a miscarriage of justice." See *Commonwealth* v. *Berry, supra* at 618; *Commonwealth* v. *DiPadova, supra* at 437. The test is whether the inadequacy of the instruction "was likely to have influenced the jury's conclusion." *Commonwealth* v. *DiPadova, supra,* quoting from *Commonwealth* v. *Berry, supra.* Here, as there, criminal responsibility was the central issue of trial; and, as recounted, abundant evidence supported a finding of longstanding mental illness of the defendant. Here, defense counsel devoted his entire closing to the argument that the defendant's paranoid schizophrenia alone (especially its symptoms of delusional thought, auditory hallucinations, and lapses in medication) had deprived him of the substantial capacity both to appreciate wrongfulness and to conform his conduct. A deficient instruction would lodge at the heart of the case.

The Commonwealth accurately points out that the court in *Berry* did not expressly make its revised instruction retroactively applicable to completed trials. It created "an appropriate instruction that may be used in *this case and in future homicide cases* [emphasis supplied] as warranted where there is evidence that a defendant had a mental disease or defect *and* [emphasis in original] consumed drugs or alcohol." *Berry, supra* at 617. However, in *DiPadova,* the court acknowledged that the underlying trial had occurred before the *Berry* decision but applied the revised instruction nonetheless to prevent a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *DiPadova,*

disease or defect worse, and even if he knew they would make his symptoms worse." (Emphasis supplied.)

460 Mass. at 439 (Appendix).

*supra* at 435 n.13. Our case occupies a similar position. In addition, our case has not become final; its trial preceded both the *Berry* and *DiPadova* decisions, but its appeal has been pending. A criminal defendant typically receives the full benefit of a change of the law while his case is pending on direct review. See *Griffith* v. *Kentucky*, 479 U.S. 314, 320-328 (1987); *Commonwealth* v. *Greineder*, 458 Mass. 207, 237 (2010), vacated on other grounds, 133 S. Ct. 55 (2012).[8]

3. *Issues on remand.* The parties have presented two issues which may recur in the event of a new trial.

a. *Admission of a prior verdict of not guilty by reason of insanity.* Doctor Sherry testified that the defendant's failure to flee from the scene of the attack contributed to his opinion that the defendant lacked the substantial capacity to appreciate the wrongfulness of his conduct. The prosecutor had reported to the judge her intention to impeach that view with documentation of a 2002 District Court finding that the defendant was not guilty of a criminal charge by reason of insanity. She argued that the earlier disposition had provided the defendant with a sense of impunity and relieved him of the fear of criminal sanctions and even civil commitment.[9] That impression would explain his indifference to escape. Defense counsel objected to admission of the 2002 finding as evidence of a prior bad act. He did not make the argument now presented on appeal: that awareness by

---

[8]While the standard of "a substantial likelihood of a miscarriage of justice" under c. 278, § 33E, review of a capital case may operate more liberally for a capital defendant than the standard of substantial risk of a miscarriage of justice for a defendant accused of a lesser crime, see *Commonwealth* v. *Randolph*, 438 Mass. 290, 297-298 (2002), in the present circumstances of a change in standard of guilt, they require the same result.

As in the *Berry* and *DiPadova* cases, the judge here had no opportunity to apply the subsequent revision of the model instruction by the Supreme Judicial Court.

[9]In her words,

> "Fairness requires that I be allowed to combat that [opinion] with what [the defendant] knew on that occasion [of the attack]. And what he knows is that he can do what he wants to do and there are no repercussions for him in the criminal system. . . . He's found [not guilty by reason of insanity] and he's allowed to go free. He's not even hospitalized."

The appellate record does not specify the 2002 criminal charge.

the jury of the defendant's release after the earlier verdict would cause them prejudicial concern that a verdict of not guilty by reason of insanity in this case would again return him to freedom as a danger to society.[10]

If these circumstances recur at a subsequent trial, the evidence of the prior disposition will be admissible over objection on either or both grounds. First, the balance of the probative value against the prejudicial effect of the disputed evidence rested in the sound discretion of the judge. *Commonwealth* v. *Pearce*, 427 Mass. 642, 648 (1998). The Commonwealth was entitled to challenge the credibility and weight of the expert opinions offered by the defendant. See *Commonwealth* v. *Amaral*, 389 Mass. 184, 192 (1983). The judge's balance fell within the range of sound discretion.

Second, the judge addressed the jury's possible fear of the unregulated release of the defendant by delivery of the instruction approved for this circumstance in *Commonwealth* v. *Mutina*, 366 Mass. 810, 821-822 (1975).[11] He informed the jury that, in the event of a verdict of not guilty by reason of insanity, the law permitted the Commonwealth to petition the court for civil commitment of the defendant for periods of evaluation, authorized continuing commitment for the duration of the defendant's condition of mental illness and dangerousness, and required notice to the district attorney as part of any judicial hearing upon the defendant's release from commitment.[12] Defense counsel had no objection to the *Mutina* instruction.

---

[10]As part of the information on the earlier disposition, the jury learned that the judge in that case had not imposed a civil commitment on the ground that the defendant did not pose a danger to others or himself as long as he maintained his medication.

[11]"On balance then, we believe it is best to entrust jurors with a knowledge of the consequences of a verdict of not guilty by reason of insanity. If jurors can be entrusted with responsibility for a defendant's . . . liberty in such cases as this, they are entitled to know what protection they and their fellow citizens will have if they conscientiously apply the law to the evidence and arrive at a verdict of not guilty by reason of insanity — a verdict which necessarily requires the chilling determination that the defendant is an insane killer not legally responsible for his acts." (Footnote omitted.) *Commonwealth* v. *Mutina*, 366 Mass. at 821-822.

[12]The judge closed with the reminder to the jury that this information served to relieve their unspoken concerns but that independently they "must decide the case solely on the evidence before you in light of the law as I have explained it to you."

b. *Instruction upon the defendant's subjective knowledge of the effect of alcohol consumption upon the symptoms of his mental illness.* Finally, the defendant argues that the jury received no evidence of the defendant's subjective knowledge of the potential effect of alcohol consumption upon his capacity to appreciate wrongfulness or to conform his conduct, and that the presentation of that element of the model charge (to which he did not object) created a substantial risk of a miscarriage of justice. No specific testimony or documentation attributed such subjective knowledge to the defendant. It remained arguable whether his long history of treatment for mental illness permitted the reasonable inference of such knowledge. The judge's inclusion of the "knowledge" component in the model instruction did not create a substantial risk of a miscarriage of justice.[13]

The element of a defendant's subjective knowledge remains as part of the revised model instructions prescribed by *Commonwealth* v. *DiPadova,* 460 Mass. at 440, and open to contention in any retrial. The appropriateness of the instruction will rest upon the evidence in that proceeding.

*Judgments reversed.*

*Verdicts set aside.*

---

[13]In *Commonwealth* v. *Whitman,* 453 Mass. 331, 350-351 (2009), the court concluded that, in the absence of evidence of the defendant's subjective knowledge of the effect of alcohol consumption, the instruction became superfluous but did not create a substantial risk of a miscarriage of justice.