## COMMONWEALTH *vs.* NINO DiPADOVA.

Middlesex. April 8, 2011. - August 22, 2011.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & DUFFLY, JJ.

*Practice, Criminal,* Instructions to jury, Confrontation of witnesses. *Homicide. Mental Impairment. Insanity. Intoxication. Constitutional Law,* Confrontation of witnesses.

Discussion of the legal principles underlying jury instructions relating to the impact, in assessing criminal responsibility, of an interaction between a mental disease or defect and voluntary consumption of alcohol or drugs. [430-433]

A criminal defendant convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty was entitled to a new trial, where the judge's instruction to the jury regarding lack of criminal responsibility did not inform the jury that, if the defendant's mental illness alone had caused him to lack criminal responsibility at the time of the murder, any drug use that increased or aggravated his condition did not negate his lack of criminal responsibility [433-436], and where the instruction erroneously informed the jury that if voluntary consumption of drugs "activated" the defendant's mental illness, the defendant was criminally responsible [436-437], thereby creating a substantial likelihood of a miscarriage of justice, given that the impact of the defendant's mental illness on his criminal responsibility was the crux of the defense and a central point of the trial as a whole [437].

Recommended revisions of the charge set forth in *Commonwealth* v. *Berry,* 457 Mass. 602 (2010) — Appendix. [439-440]

INDICTMENT found and returned in the Superior Court Department on August 26, 2004.

The case was tried before *Kenneth J. Fishman,* J.

*Kevin S. Nixon* for the defendant.

*Bethany Stevens,* Assistant District Attorney (*Kevin L. Ryle,* Assistant District Attorney, with her) for the Commonwealth.

BOTSFORD, J. The defendant was convicted of murder in the first degree in the death of Nancy Carignan, his former landlady, on theories of deliberate premeditation and extreme atrocity or cruelty. The primary defense at trial was that the defendant lacked

criminal responsibility for his actions because, at the time of the murder, he was suffering from auditory hallucinations commanding him to kill the victim. In his direct appeal, the defendant asserts that two errors at trial created a substantial likelihood of a miscarriage of justice and necessitate reversal. First, he argues that the judge instructed the jury incorrectly regarding criminal responsibility. Second, he claims that findings from the autopsy of the victim were admitted improperly through the testimony of a substitute medical examiner who did not perform the autopsy.

We agree with the defendant that the instructions regarding the interaction of the voluntary consumption of drugs and mental illness were flawed and incomplete, and created a substantial likelihood of a miscarriage of justice. We reverse the defendant's conviction and remand for a new trial on that basis.

1. *Background.* a. *The murder.* Based on the evidence at trial, the jury could have found the following. The victim was found dead in her home in Lowell on July 28, 2004.[1] She had been stabbed approximately one hundred times in the head, arms, and upper body. The victim rented rooms in her home to patients of a community mental health facility, and the defendant, who was thirty-one years old at the time, had lived there briefly in June and July, 2004. By the time of the murder in late July, he lived with his mother nearby. The defendant reportedly was friendly with the victim and there was no evidence of any animosity toward her on his part.

Police questioned the defendant several times from the evening of July 28 into the morning of July 29. After giving two written statements denying that he had seen the victim recently and making no mention of the murder, the defendant, in a manner of speaking, confessed. In a series of tape-recorded statements, he said that he had gone to the victim's home late on the night of July 26. Voices had told the defendant to get money from the victim, but the defendant just "wanted to talk to her." The victim "refused," and the voices told the defendant to kill her. He tried to fight the voices, but, "[i]t just didn't work." He recalled seeing a person stabbing the victim, and acknowledged that only he and the victim were in the room at the time and that it was "my body" doing the stabbing. Afterward, as the

---

[1]Evidence at trial suggested the victim had been killed on July 26, 2004.

defendant was walking to his mother's house, the voices said, "Good job."[2]

In his recorded statements and in later interviews, the defendant reported that he did not have "a consciousness" of the murder and had trouble remembering the details of the stabbing or events afterward. He claimed that, although he thought he should go to the police, he did not do so because "he thought it was not really something that happened." In an interview with the Commonwealth's expert witness before trial, the defendant indicated that he was not sure that he had committed the murder.

b. *Defendant's mental illness and substance abuse.* At trial, evidence was offered by both the defense and the Commonwealth indicating that the defendant had a long history of serious mental illness. Prior to the murder, the defendant had been diagnosed with bipolar disorder with psychotic features, posttraumatic stress disorder (PTSD), and attention deficit hyperactivity disorder. He had attempted suicide numerous times as a young adult and had been hospitalized at least twenty times in the preceding decade.[3] Family, friends, and local police described his erratic and disturbing behavior over the years. In particular, the defendant had reported experiencing auditory hallucinations (i.e., hearing voices) on a regular basis since the age of fifteen, and witnesses testified that he often exhibited behavior consistent with hearing voices or attributed conduct to the voices "making him do things."

Evidence also was presented suggesting that the defendant's mental illness made him prone to violent behavior. The defendant himself informed police that the voices told him "to kill people all the time." Witnesses also testified to past episodes where the defendant threatened violence while displaying symptoms of psychological distress. In one incident from May of 2004, two months before the murder, a police officer sent the

---

[2]The voluntariness of the defendant's statements and his consent to the recording of the statements were disputed by the defense. A pretrial motion to suppress was denied, and the trial judge gave a humane practice instruction when the statements were introduced at trial. The defendant does not raise an issue concerning voluntariness of the statements on appeal, and we find no error in their admission.

[3]The Commonwealth argued that some of the hospitalizations were attributable to substance abuse. The parties' expert witnesses disagreed on this point.

defendant for an involuntary psychiatric evaluation because he was "acting crazy" and threatening to kill himself and his mother. The defendant later told his stepsister that voices were telling him at the time to kill his mother.

There was evidence that in the months leading up to the murder, the defendant was "becoming more depressed and more distressed" and family members were increasingly concerned about his mental state. By July of 2004, the defendant was taking numerous psychiatric medications and receiving near-daily visits through a local treatment program. A report from that program on the day of the murder indicated that he appeared "disheveled" but "coherent"; the day after the murder, the defendant was again "disheveled" and said that he "didn't feel right" and was hearing voices. However, a police officer and an acquaintance, both of whom interacted with the defendant within hours of the murder, testified that the defendant "seemed fine" and was acting "relatively normal." The defendant told the police that the voices "come and go" but had started two weeks prior to the murder.

It was undisputed at trial that the defendant was a regular user of alcohol and drugs, including marijuana and "crack" cocaine. In addition, evidence suggested that he had used drugs shortly before the murder. The defendant's medical, psychiatric, and outpatient treatment records, admitted at trial, indicated that the defendant reported using drugs several times in the days before the stabbing. Although the evidence was conflicting as to whether he did so before or after killing the victim, both the defendant (in his statements to the police) and an acquaintance reported that the defendant had used cocaine on the night of the murder. The defendant stated that he had used crack cocaine on the night of the murder, but did not indicate clearly whether he did so before or after killing the victim. Similarly, an acquaintance testified that he had used cocaine with the defendant that night but offered conflicting testimony regarding the time when he was with the defendant. However, in one of the defendant's written statements to the police that was read into the record at trial, he stated that he had used cocaine at about 7:30 P.M. and 9:30 P.M. on the night of July 26, 2004, as well as early in the morning of July 27. Other evidence at trial suggested that the killing occurred at approximately 11:30 P.M. on July 26.

There was also evidence of an interaction between the defendant's drug use and his mental illness. His former girl friend testified that his use of cocaine would "speed up the process of him going into a form of psychosis"; she also stated, however, that he exhibited symptoms of mental instability and hearing voices even when he was not using drugs. The defendant's treatment records attributed several episodes of psychological "decompensation" and hospitalizations to drug use combined with failure to take his psychiatric medications. Those records also indicated the defendant was aware that his drug use contributed to and exacerbated the symptoms of his mental illness. In addition, the defendant told the police that the voices in his head "love when I do drugs" because it made the voices "more powerful."[4]

c. *Evidence regarding criminal responsibility.* At trial, the defendant claimed that he lacked criminal responsibility for his actions because, due to a mental disease or defect, he lacked the substantial capacity at that time both to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. See *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967) (*McHoul*). In support of this claim, the defendant offered the expert testimony of Dr. Tali Walters, a forensic and clinical psychologist. Walters concluded that the defendant lacked criminal responsibility as a result of his bipolar disorder with psychotic features[5] and PTSD. She opined that at the time of the murder he experienced auditory hallucinations as a result of his bipolar disorder, and dissociation (i.e., feeling that he was watching someone else stab the victim) as a result of his PTSD. While she noted that the defendant may have exaggerated his symptoms to some degree, she concluded that his claims of hearing voices were not fabricated, and that he did hear a voice or voices telling him to stab the victim.

---

[4]In 2006 or 2007, the defendant told the expert witness for the defense, "When I'm on drugs, alcohol, meds, I have no conscience. It's when the . . . voices take over." There is merit in the defendant's point that this statement, made several years after the fact, does not fairly reflect his understanding at the time of the murder.

[5]Walters identified the defendant's "psychotic features" as long-standing auditory hallucinations, paranoia, grandiose delusions, "depersonalization" (i.e., the experience of "not really being in his own body"), and "ideas of reference" (e.g., believing the television was giving him messages).

Walters opined that the defendant's inability to appreciate the wrongfulness of his actions at the time of the murder was evidenced by the fact that, after he stabbed the victim, the voices said he had done a "good job." In addition, his statement that he was "compelled to obey" the voices indicated to Walters that he "was unable to engage in any kind of alternative behavior" or stop his actions once he began stabbing the victim. As a result, Walters found that the defendant, at the time of the murder, met both prongs of the *McHoul* test.

Walters acknowledged that the defendant had a substance abuse problem, that his drug use apparently had been increasing during 2004, and that he had used cocaine on the night of the murder. She also opined that "when somebody uses cocaine or alcohol or marijuana, on top of these kinds of symptoms of mental illness, they exacerbate, they make bigger, they make more intense . . . the symptom."[6] Nevertheless, she determined that it was "the voice," rather than the cocaine, "that was the primary factor in his stabbing of [the victim]." Based on the defendant's history, Walters also concluded that "his hearing voices is completely independent of his use of drugs."[7] She noted in particular that the defendant reported continuing auditory and visual hallucinations while incarcerated, despite the fact that he was taking medications and not using illegal drugs.

Dr. Malcolm P. Rogers, a psychiatrist, testified as a rebuttal witness for the Commonwealth. In Rogers's opinion, at the time of the murder the defendant did not meet either prong of the *McHoul* test and was criminally responsible for his actions. Rogers agreed that the defendant had a "substantial history" of mental illness, that he had "ongoing psychiatric problems," and

---

[6]Walters testified that, although the defendant told her he was having "serious problems with drugs and his mental health" at the time of the murder, he did not indicate that he was aware that drugs worsened his mental health issues.

[7]At trial, the prosecutor read aloud part of Walters's report stating that the defendant, in the months prior to the murder, "was considered to be in increased risk due to potential behaviors and altered mental state *triggered by* patient's increased substance abuse" (emphasis added). Walters neither disavowed nor clarified the statement, and her report was not admitted at trial. In light of Walters's repeated statements that the defendant's mental illness existed independent of his drug use, the statement in her report does not fairly suggest that his drug use actually "triggered" the mental illness itself.

that the diagnosis of bipolar disorder was "probably accurate."[8] At the same time, Rogers concluded that the defendant suffered from antisocial personality disorder and substance abuse issues — neither of which qualified as a mental disease or defect that could render the defendant criminally irresponsible — which might explain some symptoms attributed to his bipolar disorder. Rogers also agreed that there was evidence of true auditory hallucinations in the defendant's past. However, he opined that the defendant at times "used voices as an excuse" for objectionable behavior, and had exaggerated his auditory hallucinations in his statements to police, when speaking with Rogers, and while completing his psychological testing.

Rogers also opined that, at the time of the murder, the defendant was "not in an acute psychotic state in the sense that he was not delusional and was not being directed by hallucinations so that he was not able to conform his behavior or appreciate wrongfulness." In support of his opinion, Rogers noted that according to some witnesses, the defendant was not "acting in a bizarre fashion" in the hours surrounding the murder, and that the voices the defendant reported at the time of the murder were atypical in several respects. Rogers also suggested that evidence indicating the defendant made efforts to cover up his actions after the stabbing reflected both an ability to conform his conduct to the law and an awareness that his actions were wrong.

Rogers noted the defendant's history of "poly substance abuse, particularly cocaine abuse" and opined that his cocaine use "had significant impact on his mental state during that time." He testified that some symptoms described in the defendant's treatment records would be consistent with either bipolar disorder or cocaine use, making it "very difficult to sort out what might have been contributions from drug use." He also noted that some of the defendant's hospitalizations had been attributed to "substance-induced mood disorder" rather than his mental illness.

2. *Instruction on criminal responsibility.* a. *Legal principles.* The defendant takes issue with the jury instructions relating to the impact, in assessing criminal responsibility, of an interaction

___

[8]Dr. Rogers did not express an opinion regarding the accuracy of the defendant's diagnoses of posttraumatic stress disorder (PTSD) and attention deficit hyperactivity disorder.

between a mental disease or defect and voluntary consumption of alcohol or drugs. We turn first to the principles that govern in this area of the law. Under the *McHoul* test, a defendant is not criminally responsible for his actions — and, therefore entitled to a verdict of not guilty — if, at the relevant time and due to a mental illness (mental disease or defect), he lacks the substantial capacity to appreciate the wrongfulness of an action or to act in conformity with the law.[9] *McHoul*, 352 Mass. at 546-547. See *Commonwealth v. McGrath*, 358 Mass. 314, 319-320 (1970).

The *source* of the lack of substantial capacity is the critical factor in determining whether the defendant is criminally responsible. A determination of criminal irresponsibility is available only where the inability to appreciate the wrongfulness of conduct, to conform conduct to the law, or both, is due to a mental disease or defect. Voluntary consumption of alcohol or drugs, intoxication and even alcoholism or drug addiction do not qualify as "mental disease[s] or defect[s]" in the *McHoul* formulation; as a result, a defendant whose lack of substantial capacity is due solely to one of these conditions, and not to any mental disease or defect, is criminally responsible. See *Commonwealth v. Herd*, 413 Mass. 834, 839 (1992); *Commonwealth v. Sheehan*, 376 Mass. 765, 770 (1978).

Conversely, where a defendant's mental disease or defect, by itself, causes a lack of substantial capacity, the defendant's consumption of alcohol or drugs does not lead to forfeiture of an otherwise valid defense of lack of criminal responsibility. This is true even where that consumption or intoxication may exacerbate or aggravate the symptoms of the mental condition, and even where the defendant knows such aggravation may result, so

---

[9]We use "lacks criminal responsibility," or "criminal irresponsibility," terms that derive from *Commonwealth* v. *McHoul*, 352 Mass. 544, 555 (1967) (*McHoul*), at times in this opinion as a shorthand for the more cumbersome text of the formal *McHoul* standard (i.e., "as a result of mental disease or defect [lacking] substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law"). *Id.* at 547, quoting American Law Institute, Model Penal Code, Proposed Official Draft 66 (1962). We also generally use the phrase "lack of substantial capacity" as a shorthand for *both* lack of substantial capacity to appreciate the wrongfulness of conduct and lack of substantial capacity to conform conduct to the requirements of the law.

long as the defendant already lacked criminal responsibility absent the effects of the substances. See *Commonwealth* v. *Berry,* 457 Mass. 602, 616-618 (2010) (*Berry*). The legally relevant question is not whether the defendant consumed alcohol or drugs, but what was the cause of his loss of substantial capacity: the consumption or the mental condition? See *id.* at 616-617 ("a defense of lack of criminal responsibility is not defeated where the defendant also consumed alcohol or drugs, as long as the mental disease or defect was the cause of the lack of criminal responsibility").

In other circumstances, a defendant's mental disease or defect may interact with alcohol or drugs in such a way as to push the defendant "over the edge" from capacity into incapacity (i.e., from criminal responsibility into criminal irresponsibility). See *Commonwealth* v. *Angelone,* 413 Mass. 82, 86 (1992) (alcohol and drug use lowered threshold for seizures caused by temporal lobe epilepsy); *Commonwealth* v. *Brennan,* 399 Mass. 358, 359-360 (1987) (alcohol triggered aberrant behavior caused by organic brain syndrome); *Commonwealth* v. *Shelley,* 381 Mass. 340, 343-345 (1980) (alcohol allegedly induced dissociative state).[10] In such cases, where the combination of alcohol or drug consumption and a mental disease or defect causes a defendant who previously was criminally responsible to become criminally irresponsible, lack of criminal responsibility is established even if voluntary consumption of alcohol or other drugs activated or intensified the mental illness, *unless* the defendant knew or had reason to know that the alcohol or drugs would have that effect. See *Commonwealth* v. *Brennan, supra* at 363. See also *Commonwealth* v. *Angelone, supra* at 86-87 ("it did not matter that the defendant's drug consumption triggered a seizure, unless

---

[10]In our case law, this has been termed "activation" of the mental condition, and prior cases have distinguished "activation" of "latent" mental conditions from "exacerbation" of "active" mental illnesses. See, e.g., *Commonwealth* v. *Berry,* 457 Mass. 602, 617-618 & n.9 (2010) (*Berry*) (employing such language in recommended jury instruction). On reflection, we think that the use of such terms, particularly in jury instructions, may be confusing. The pertinent question for the jury is whether such mental illness, prior to intoxication, deprived that defendant of the substantial capacity to appreciate wrongfulness of conduct or to conform conduct to the law. That question is not affected by whether the mental condition is latent or active. We set forth a revised version of the *Berry* instruction in an Appendix to this opinion.

. . . the Commonwealth then proved beyond a reasonable doubt that the defendant knew or had reason to know that his drug consumption would do so"). Accordingly, in contrast to the situation described in the previous paragraph, in these cases, the jury's focus of inquiry is not the cause of the defendant's loss of substantial capacity but the defendant's *knowledge* of the effects of his use of alcohol or drugs.[11]

b. *The instruction given.* During his explanation regarding criminal responsibility, the judge instructed the jury:

> "[1] [E]ven if you determine that the defendant does have a mental disease or defect, lack of criminal responsibility is not present when the defendant knows or in the circumstances had reason to know that his consumption of a substance will cause him to be substantially incapable of either appreciating the wrongfulness of his conduct or conforming his conduct to the requirement of law or both.

> "[2] In determining what the defendant had reason to know about the consequences of his consumption of a substance, you should consider that question solely from the defendant's point of view, including his mental capacity.

> "[3] If the Commonwealth persuades you beyond a reasonable doubt that the defendant committed the crime and did not have a mental disease or defect when he committed the crime, *or that the mental disease or defect was activated by the voluntary consumption of drugs*, then it has proved that the defendant was criminally responsible and you need go no further" (emphasis added).

The first two sentences of this instruction are a component of the model instructions "[f]or use in appropriate cases." Model

[11]A defendant need not know that he suffers from the mental disease or defect so long as that mental condition, once triggered, leads to violent conduct *and* the defendant has knowledge that voluntary consumption of alcohol or drugs causes or may cause him to act violently. See *Commonwealth* v. *Herd*, 413 Mass. 834, 842 (1992) (defendant need not know he had mental disease or defect so long as he knew intoxication from voluntary cocaine consumption caused or might cause him to beat someone). See also *Berry*, 457 Mass. at 614 ("the main issue is not whether the defendant knew he had a mental illness, but whether he knew that his intoxication caused or might cause him to become violent").

Jury Instructions on Homicide 51-52 (1999). The third sentence, and particularly the emphasized clause, was proposed to the judge by the Commonwealth. The judge did not provide any further instructions on the interaction between voluntary consumption of drugs and a mental disease or defect.[12] The defendant focuses on the first sentence and the emphasized clause in the third sentence as erroneous and misleading to the jury. In light of the legal principles discussed previously and the evidence presented at trial, we conclude that the instructions were flawed.

We addressed a situation similar to the present one in *Berry*. The jury in *Berry* could have found from the evidence at trial that the defendant's mental illness alone — entirely separate from her consumption of alcohol and possible intoxication — caused her to lack criminal responsibility on the night in question. *Berry*, 457 Mass. at 615. We concluded that the instruction given to the jury on that issue, which was largely identical to the first two sentences of the challenged jury instruction in this case, was unclear and misleading. Accordingly, we reversed the defendant's conviction. *Id.* at 603. We noted that the instruction given did not provide guidance regarding "voluntary intoxication and its role in the defense of lack of criminal responsibility where a defendant's existing and active mental disease or defect reached the level of lack of criminal responsibility *separate* from the consumption of alcohol" (emphasis added). *Id.* at 615. In the absence of a clear instruction on that issue, the instructions the jury did receive could have led them in that case to believe, erroneously, that, "even if . . . the defendant's mental disease or defect, separate from the voluntary consumption of alcohol, caused her to lose a substantial capacity to conform her conduct to the requirements of the law, any alcohol that exacerbated her conduct would result in the forfeiture of the defense of lack of criminal responsibility." *Id.* at 615.

For substantially the same reasons as in *Berry*, the model

---

[12]The judge properly instructed the jury regarding the impact of drug consumption in other areas of the law besides criminal responsibility. Thus, he informed the jury that they could consider the defendant's consumption of drugs in deciding whether the defendant's statements were voluntary and in determining his state of mind, and that they could consider evidence of "mental impairment," including use of drugs, in determining whether the defendant intended to kill or cause grievous bodily harm, knew that death would result, premeditated the killing, or acted in a cruel or atrocious manner.

instruction was inadequate in the context of this case.[13] As previously noted, there was no significant dispute at trial that the defendant suffered from mental illness (i.e., a mental disease) and had used drugs around the time of the murder; the primary area of disagreement between the parties was over the defendant's criminal responsibility, that is, did he lack the substantial capacity to appreciate the wrongfulness of his conduct or to act in accordance with the law. Rogers opined that — regardless of drug use — the defendant was below the threshold of the *McHoul* test during the night in question; Walters testified that — regardless of drug use — the defendant was past that threshold. At the same time, there was evidence from Walters, other witnesses, medical records, and from the defendant himself that drug use aggravated the symptoms of his mental illness.

In these circumstances, the defendant was entitled to an instruction informing the jury that, if his mental illness alone had caused him to lack criminal responsibility at the time of the murder, any drug use that increased or aggravated his condition did not negate his lack of criminal responsibility. As we noted in *Berry*, the model instruction does not address that aspect of the law. It concerns only the impact of alcohol or drug consumption in those situations in which a defendant's mental disease or defect does *not*, independently, render the defendant criminally irresponsible.[14] As in *Berry*, in this case, given the absence of a

---

[13]*Berry* was decided after the trial in this case, and established new jury instructions for use in future cases in lieu of the model instructions. Nonetheless, in *Berry* itself, we focused on the inadequacy of the model instructions in light of the evidence at trial, and concluded that these inadequacies produced a substantial likelihood of a miscarriage of justice. *Berry*, 457 Mass. at 618. We reach the same conclusion here.

[14]Particularly germane to this case is the requirement in the *Berry* instruction that after the jury are instructed on the role of knowledge of the effects of alcohol or drug consumption (where, as here, this instruction is relevant, see *Berry*, 457 Mass. at 617-618 & n.9), the jury be told the following:

"Where a defendant has [a] . . . mental disease or defect that caused [him] to lose the substantial capacity to appreciate the wrongfulness of [his] conduct or the substantial capacity to conform [his] conduct to the requirements of the law, the defendant's consumption of alcohol or another drug cannot preclude the defense of lack of criminal responsibility."

*Id.* at 618. A revised version of this statement appears in the instruction contained in the Appendix.

proper instruction, the jury could have misinterpreted the model instruction and concluded, erroneously, that even if the defendant's mental illness by itself caused him to lack substantial capacity, "because [he] had consumed [drugs] that contributed to [his] incapacity, that would render the lack of criminal responsibility defense moot." *Berry, supra* at 618.

The addition of the italicized clause of the third sentence to the instructions in this case introduces a further flaw not found in *Berry*. The clause informed the jury that if voluntary consumption of drugs "activated" the defendant's mental illness, he was criminally responsible. In fact, as noted previously, where a defendant's substance abuse interacts with a mental disease or defect, that defendant is criminally responsible *only* if two conditions are true: (1) his mental condition alone, prior to the consumption of the drugs, did not render him criminally irresponsible; and (2) he knew or reasonably should have known that this consumption would cause him to lose substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law — that is, would cause him to become criminally irresponsible. See, e.g., *Commonwealth* v. *Brennan*, 399 Mass. at 363. In effect, the italicized clause in the third sentence of the instruction eliminated the second condition, the knowledge requirement, altogether.[15]

Compounding the error of the instructions in this case is a critical distinction between the evidence at trial in *Berry* and the evidence here. In *Berry*, there was no evidence presented that the defendant knew or should have known that alcohol would affect her mental condition; accordingly, we concluded that no instruction regarding such knowledge was necessary or appropriate. See *Berry*, 457 Mass. at 618-619. Here, in contrast, there was evidence from the defendant himself, as well as his treatment

---

[15]In doing so, the clause also appears to contradict the instruction's first sentence. In particular, the first sentence contained a proper explanation of the knowledge element — that is, the need for the defendant to know the exacerbating effect of his drug consumption; but the third sentence, by not mentioning knowledge, suggested, incorrectly, that knowledge of the effects of drug consumption is not a critical issue in assessing the defendant's level of criminal responsibility. Furthermore, neither the first nor the third sentence properly explained the law where the defendant already lacked criminal responsibility prior to the drug consumption.

records, indicating that he knew at the time of the murder that drugs intensified the symptoms of his mental illness. In light of that evidence, it was critical that the instructions given to the jury clarify how the defendant's knowledge was to be considered. Specifically, the jury should have been instructed that (1) if the defendant's mental illness did not reach the level of a lack of criminal responsibility until he consumed drugs, he was criminally responsible if he knew (or should have known) that the consumption would have the effect of intensifying or exacerbating his mental condition; and, in contrast, (2) if the defendant's mental illness *did* reach the level of lack of criminal responsibility even in the absence of his consumption of drugs, it was irrelevant whether he took drugs knowing that they would exacerbate that condition. See *Berry, supra* at 618. The instruction given in this case fails on both counts.

Because the defendant did not object to the jury instruction at trial, we must determine if the errors created a substantial likelihood of a miscarriage of justice. *Id.*, citing *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). To do so, we ask whether the error "was likely to have influenced the jury's conclusion." *Berry, supra.* For substantially the reasons articulated in *Berry*, the inadequacy of the instruction in this case necessitates reversal. The impact of the defendant's mental illness on his criminal responsibility was the crux of the defense and a central point in the trial as a whole. Extensive testimony and other evidence was presented to the jury regarding both his illness and his drug use. Because we cannot inquire into the minds of the jury, we cannot know whether they credited the evidence, principally provided by Dr. Walters, suggesting that the defendant's mental illness alone rendered him criminally irresponsible. If they did credit that evidence, however, the jury instructions did not explain to them the law they were to apply, and in fact steered them toward returning an improper verdict on the basis of the defendant's drug use. Moreover, the instructions gave conflicting guidance on how the jury ought to consider the evidence indicating that the defendant knew how his drug use would affect his mental illness. The defendant is "entitled to a new trial, with instructions that adequately clarify the . . . issues presented to the jury." *Id.* at 615. See Appendix.

3. *Medical examiner's testimony.* We address the second claim of error only briefly. The medical examiner who performed the autopsy of the victim was unavailable at the time of trial. In order to admit evidence regarding the autopsy, the Commonwealth called a substitute medical examiner, whose testimony consisted largely of reading, often verbatim, from the autopsy report.[16] Although the defendant did not object to this testimony at trial, he now asserts that the admission of the autopsy report's findings through the substitute medical examiner's testimony violated his confrontation rights. See *Commonwealth* v. *Nardi*, 452 Mass. 379, 392-394 (2008).

As we clarified in *Nardi*, decided after the trial in this case, such testimony implicates a defendant's confrontation rights. Because the error in the jury instruction addressed above necessitates a new trial, however, we need not determine whether the testimony created a substantial likelihood of a miscarriage of justice. Cf. *Commonwealth* v. *McCowen*, 458 Mass. 461, 481 (2010). We trust that, at a retrial of the defendant, such testimony will be recognized as raising a *Nardi* issue, and the defendant can make an informed decision about how to proceed with a full understanding of his rights.[17]

4. *Conclusion.* For the foregoing reasons, the judgment is reversed and the verdict set aside. The case is remanded for a new trial in accordance with this opinion.

*So ordered.*

---

[16]The substitute medical examiner also drew a diagram of the victim's wounds based on the report. That procedure was agreed to by the parties as a means to avoid the admission of approximately one hundred "extremely graphic and prejudicial" autopsy photographs.

[17]Where the medical examiner who performed the autopsy is unavailable at trial, the Commonwealth is free to proceed by calling a substitute medical examiner to provide his or her own opinions (even if based on the autopsy report), see *Commonwealth* v. *Nardi*, 452 Mass. 379, 389 (2008), or by admitting (with proper authentication) autopsy photographs and asking a substitute medical examiner to describe what he or she observes in those photographs. See *Commonwealth* v. *Durand*, 457 Mass. 574, 587 n.14 (2010). The defendant may also choose voluntarily to waive his right to confrontation in the course of negotiating an alternative approach with the Commonwealth.

APPENDIX.

## RECOMMENDED REVISION OF BERRY *INSTRUCTION*[1]

"A defendant's lack of criminal responsibility must be due to a mental disease or defect. Intoxication caused by the voluntary consumption of alcohol or drugs, by itself, is not a mental disease or defect. Where a defendant lacks substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law solely as a result of voluntary intoxication, then he is criminally responsible for his conduct.

"However, the consumption of alcohol or drugs may trigger or intensify (make worse) a defendant's preexisting mental disease or defect. If it does so, and the mental disease or defect then causes the defendant to lose the substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, the defendant is not criminally responsible for his conduct.

[Continue as follows where there is evidence of defendant's knowledge:]

"There is one exception to the principle just stated. A defendant who loses the substantial capacity I have just described after he consumes drugs or alcohol, who knows or had reason to know that consumption would trigger or intensify in him a mental illness or condition that could cause him to lack that capacity, *is* criminally responsible for his resulting conduct. In deciding what the defendant had reason to know about the consequences of his consumption of drugs or alcohol, you should consider the question solely from the defendant's point of view, including his mental capacity and his past experience with drugs or alcohol. But you must keep in mind that . . .

[or]

[Continue as follows where there is *no* evidence of a defendant's knowledge:

"You must also keep in mind that . . . ]

"where a defendant, at the time the crime is committed, has a mental disease or defect that itself causes him to lack the substantial capacity that I have just described, he is not criminally responsible for his conduct regardless of whether he uses or does not use alcohol or drugs. That is true even if he does use alcohol or drugs and the alcohol or drug use makes the symptoms of his mental disease or defect worse, and even if he knew they would make his symptoms worse.

"Remember that the Commonwealth must prove to you beyond a reasonable doubt that the defendant was sane at the time the crime was committed, that is, that the defendant did *not* lack criminal responsibility at that time. It is the Commonwealth's burden to prove, at the time of the crime, at least one of the following facts beyond a reasonable doubt:

"that the defendant did not suffer from a mental disease or defect; or

"that if the defendant did suffer from a mental disease or defect, he nonetheless retained the substantial capacity to appreciate the wrongful-

[1]See *Commonwealth* v. *Berry*, 457 Mass. 602, 617-618 (2010).

ness of his conduct or to conform his conduct to the requirements of the law; or

"that if the defendant lacked the substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to legal requirements, his lack of such capacity was solely the result of voluntary intoxication by alcohol or other drugs; or

"that if the defendant lacked the substantial capacity I have just described due to a combination of a mental disease or defect and his voluntary consumption of alcohol or other drugs, he knew or should have known that his use of the substance[s] would interact with his mental disease or defect and cause him to lose such capacity.

"If the Commonwealth has failed to prove at least one of these four facts beyond a reasonable doubt, then you must find the defendant not guilty by reason of lack of criminal responsibility."