LOWY, J.
**717 *31 Shots were fired into a crowd attending an outdoor baby shower in Brockton around 11 P.M. on April 25, 2009. Multiple people were injured, and one person was killed. A jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation.[1] We have consolidated the defendant's appeal from his convictions with his appeal from the denial of his motion for a new trial.
State police Trooper Robert F. Clements, Jr., who was assigned to the district attorney's office, testified at trial that the defendant told police during two separate interviews that he was picked up on the night of the shooting in the area of a Dunkin' Donuts restaurant **718 that was near the crime scene, and next to which three people were observed jumping into a back yard after the shooting. This testimony was false. As demonstrated by the trooper's police reports and transcripts of the defendant's interviews with police, the defendant never told police that he was picked up at or near Dunkin' Donuts.[2] Because the Commonwealth's erroneous elicitation of and failure to correct this false testimony created a substantial likelihood of a miscarriage of justice, we reverse.[3]
Background. We recite pertinent facts the jury could have found, with an emphasis on testimony about where the defendant was "picked up" on the night of the shooting. The Commonwealth's theory at trial was that the defendant tried to kill the victim's boyfriend at a baby shower, and that the defendant inadvertently killed the victim instead. The defendant and the victim's boyfriend were members of rival gangs, and the defendant made known that *32 he did not like the victim's boyfriend and "was going to get him." The defendant was part of a group that decided to target the victim's boyfriend. A member of that group learned that the boyfriend **719 was going to be at a party on April 25, 2009, but after learning that the party was a baby shower he said at a meeting in the week before the shooting that they "shouldn't hit it." The defendant responded that he still "wanted to do it" and that he did not care "if it was a baby shower or not."
A friend of the defendant electronically sent "instant messages" to the defendant around 2 or 3 P.M. from the April 25 baby shower, telling the defendant that the victim's boyfriend was there. Shots were later fired from the street into a crowd attending the baby shower around 11 P.M. , killing the victim. Some witnesses to the shooting thought there was one shooter, and others thought there were more. Nobody at trial identified the defendant as a shooter.
A resident of the area testified that she saw three people jump into her back yard after she heard gunshots just before 11 P.M. on April 25, and that her back yard abuts a Dunkin' Donuts. The Dunkin' Donuts is roughly a five-minute walk from the crime scene.
The defendant's marijuana dealer, David Barros, testified that the defendant telephoned and asked for a ride on the night of the shooting. Barros picked up the defendant around 11:30 P.M. When Barros asked the defendant whether the defendant knew how many people had been shot at the baby shower, the defendant said, "I don't know yet."
Barros did not remember at trial where he picked up the defendant. The trooper testified that Barros had told police that he picked up the defendant near Dunkin' Donuts. Although Barros testified that he did not remember telling police that he picked up the defendant near Dunkin' Donuts, he admitted that while he and the defendant were driving, they stopped at a traffic light next to the Dunkin' Donuts and saw "an unmarked police car pass[ ] by with the lights flashing."
The trooper also testified that the defendant told police on two occasions that Barros picked him up in the area of Dunkin' Donuts. According to the trooper, the defendant also told police that "when [the defendant] was in [Barros]'s car in the area of Dunkin' Donuts, he had seen police cars going by with their lights on."
Roughly four hours after the shooting, at around 3 A.M. , the defendant went to the house of the friend who had sent him instant messages from the baby shower. The friend testified that it was uncommon for the defendant to go to her house around that time of the morning, and that although the defendant was usually "hyper and jumpy," he was more nervous than usual and "was a **720 weird type of jumpy and nervous." It seemed to the friend that the defendant already knew about the shooting.
The Commonwealth did not present a murder weapon, and bullets found at the crime scene were not compared against any particular firearm. However, the defendant was seen with a .25 caliber firearm in the month before the shooting, and a ballistics expert testified that the fatal bullet found in the victim's body was consistent with .25 caliber ammunition and that multiple .25 caliber cartridge casings were recovered from the crime scene. Additionally, the defendant was seen looking for the victim's boyfriend with a .22 caliber handgun in the months after the shooting, and there was testimony that the shots at the baby shower sounded like they came from a .22 caliber handgun. Two days after the shooting, the defendant was seen with *33 bullets and a revolver that was not fully loaded.
There was evidence that the defendant confessed multiple times to killing the victim. At a gathering after the shooting, the defendant "jumped up and said he killed that bitch." On cross-examination, however, a witness to the defendant's outburst testified that after the defendant said he "killed the bitch," "[e]veryone start[ed] laughing" and one of the people present said, "[H]e's joking." Additionally, the witness admitted that the defendant had earlier told him that the defendant had nothing to do with the shooting.[4]
A childhood friend of the defendant testified that the defendant confessed multiple times to killing "[the boyfriend]'s bitch." The friend testified on cross-examination that he was "laughing at" the defendant and "thought [the defendant] was joking" at the time of the confessions. He also acknowledged that he had told the grand jury it was in the defendant's nature to "lie[ ] about things." However, on redirect examination, the friend testified that he no longer thought the defendant was joking when he reported the defendant's actions to the police.
Another witness testified that she overheard the defendant say to someone else that he shot "the bitch," referring to the victim. According to the witness, the defendant told her not to say anything about what she heard and she delayed going to the police because she "didn't want to die." Another witness who was present during the conversation between the defendant and the other **721 individual testified, "I'm pretty sure if I heard someone confess that they murdered someone I would have remembered it.... And I really don't remember hearing that." She also acknowledged that she intentionally did not pay attention to the defendant's conversation.
The defendant moved for a new trial on various grounds. Most relevant to our decision is the defendant's claim that the trooper testified falsely that the defendant told police that Barros picked him up on the night of the shooting at the Dunkin' Donuts near the crime scene. After a hearing, the judge denied the motion in a written decision. With respect to the trooper's testimony about where the defendant said he was picked up, the judge concluded that although "there is a discrepancy between [the trooper's] testimony on direct examination and his police report," "[t]he mere fact that a prosecution witness gives inconsistent testimony does not amount to a violation of [the cases] dealing with false testimony." The judge also observed that defense counsel "corrected" the inconsistency on cross-examination and that the trooper "adopted" the information in his police report. However, in his analysis, the judge discussed only the trooper's testimony about the first interview with the defendant, even though the trooper testified that the defendant had said he was picked up in the area of Dunkin' Donuts during two separate interviews.
Discussion. In reviewing the denial of a motion for a new trial, "[w]e review the motion judge's decision for abuse of discretion." Commonwealth v. Burgos, 462 Mass. 53, 60, 965 N.E.2d 854, cert. denied, 568 U.S. 1072, 133 S.Ct. 796, 184 L.Ed.2d 589 (2012). Where, as here, the motion judge was also the trial judge, "we afford particular deference" to the judge's factual findings. Commonwealth v. Ferreira, 481 Mass. 641, 649, 119 N.E.3d 278 (2019).
*34 "The Commonwealth may not present testimony at trial 'which [it] knows or should know is false.' " Commonwealth v. Forte, 469 Mass. 469, 490, 14 N.E.3d 900 (2014), quoting Commonwealth v. Sullivan, 410 Mass. 521, 532, 574 N.E.2d 966 (1991), S.C., 469 Mass. 340, 14 N.E.3d 205 (2014). Nor may the Commonwealth, "although not soliciting false evidence, allow[ ] it to go uncorrected when it appears." Commonwealth v. Hurst, 364 Mass. 604, 608, 307 N.E.2d 835 (1974), quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Because the defendant did not raise at trial the issue of false testimony,[5] we review any error for a substantial **722 likelihood of a miscarriage of justice.[6] See Commonwealth v. Woollam, 478 Mass. 493, 504, 87 N.E.3d 64 (2017), cert. denied, --- U.S. ----, 138 S. Ct. 1579, 200 L.Ed.2d 766 (2018), citing Burgos, 462 Mass. at 60, 965 N.E.2d 854 (reviewing for substantial likelihood of miscarriage of justice claim of "prosecutorial misconduct in failing to correct" false testimony).
The trooper testified at trial that during the trooper's first interview with the defendant, the defendant initially told the trooper that on the night of the shooting "he was at a friend Derrick Wells'[s] house," and then later "recalled that he was with a friend ... Barros." According to the trooper, the defendant "stated that [Barros] had picked him up over in the area of Dunkin' Donuts." However, as the judge concluded, "there is a discrepancy between [the trooper's] testimony on direct examination and his police report."
According to the police report, the defendant told the trooper, in relevant part:
"when the shooting of [the victim] happened, [the defendant] was with a friend named 'David' .... [The defendant] was at [Wells]'s residence on Winthrop Street when David called him.... [The defendant] asked David to come pick him up.... [W]hen he was talking to him, David said he was over by Addison Avenue.... David told [the defendant] there were a lot of police by the Dunkin Donuts ...."
**723 Although the report does not state where the defendant met up with Barros, the implication is that the defendant was still at Wells's house on Winthrop Street when *35 he asked Barros for a ride.[7] It is possible from the report's language that the defendant told Barros to pick him up elsewhere. But Barros seems to have been near the Dunkin' Donuts when he was talking with the defendant on the telephone. Therefore, he would have had to go somewhere other than the Dunkin' Donuts to "come pick [the defendant] up."
Defense counsel addressed on cross-examination the discrepancy between the trooper's testimony and the police report by going line-by-line through the relevant portion of the report. In his decision on the defendant's motion for a new trial, the judge found that the trooper "adopted" his police report and "affirmed that the defendant said that he was at his friend [Wells]'s house, rather than Dunkin' Donuts, when he asked Barros to pick him up." In response to defense counsel's question whether the defendant said "he was picked up at ... Wells'[s] on Winthrop Street by ... Barros," the trooper replied, "That was his ... initial story."[8] Thus, we agree with the motion judge that any error by the Commonwealth in eliciting or failing to correct the trooper's testimony about his first interview with the defendant did not in and of itself require a new trial. See United States v. Chavez, 894 F.3d 593, 601 (4th Cir.), cert. denied, --- U.S. ----, 139 S. Ct. 278, 202 L.Ed.2d 184 (2018) ("It is difficult to imagine how a conviction could have been 'obtained by the knowing use of perjured testimony' when that testimony was almost immediately corrected by the witness himself").
The analysis is different for the trooper's testimony about his second interview with the defendant, the falsity of which neither party corrected at trial. The trooper testified that during this second interview, the defendant stated that on the night of the shooting Barros "picked him up in the area of Dunkin' Donuts." The prosecutor then asked the trooper, "At some point during this interview with the defendant ..., did he then change his story and indicate that he had not, in fact, been picked up at Dunkin' Donuts by ... Barros?" The trooper replied, "Yes.... [I]t changed **724 to ... his house." This questioning and testimony created the impression that the defendant initially told police during the second interview that he was picked up at or near Dunkin' Donuts, next to the very location where three people were observed jumping into a back yard after the shooting, and then changed his story by saying he was picked up at his house.
However, the second interview transcript reveals that the trooper characterized falsely the defendant's statements regarding where the defendant was picked up on the night of the shooting. The defendant never stated that he was picked up at or near the Dunkin' Donuts. He pointedly denied on at least four occasions being picked up there despite the police officers' questions and comments suggesting that he was, and he consistently asserted that he was picked up at his house. The judge did not address, in the context of the defendant's false testimony claim, the trooper's testimony about the defendant's second interview with police.[9] It is apparent *36 from the transcript of the second interview, however, that the trooper testified falsely as to both where the defendant said he was picked up and the lack of consistency in the defendant's story about where he was picked up.[10]
Nothing in the record definitively resolves whether the prosecutor purposely elicited false testimony. However, she said at sidebar -- in the midst of her questioning about the second interview -- that she was "essentially going through" the interview transcripts. The prosecutor should have known, based on these transcripts, that the defendant had not said at the second interview that he was picked up at or near the Dunkin' Donuts, and she should have corrected the trooper's testimony to the contrary. Cf. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor").
**725 Some of our cases suggest that a prosecutor need not correct false testimony where, as here, the defendant has access at trial to materials showing the testimony is false.[11] See Burgos, 462 Mass. at 60, 62, 965 N.E.2d 854 ; Commonwealth v. Jewett, 442 Mass. 356, 363, 813 N.E.2d 452 (2004) ; Commonwealth v. Mercado, 383 Mass. 520, 525, 420 N.E.2d 330 (1981) ; Commonwealth v. Heffernan, 350 Mass. 48, 55, 213 N.E.2d 399, cert. denied, 384 U.S. 960, 86 S.Ct. 1586, 16 L.Ed.2d 673 (1966) ("defendant's full knowledge of the facts is for us the definitive answer to the defendant's claim of suppression of evidence and related use of perjured testimony"). In his decision denying the defendant's motion for a new trial, the judge cited a Federal case to that effect. See United States v. Mangual-Garcia, 505 F.3d 1, 10-11 (1st Cir. 2007), cert. denied sub. nom. Villanueva-Rivera v. United States, 553 U.S. 1019, 128 S.Ct. 2081, 170 L.Ed.2d 819 (2008) ("When the defendant knows about the false testimony and fails to bring it to the jury or the court's attention, the assumption is that he did so for strategic reasons, and the defendant will not be allowed to question his own strategic choices on appeal").
However, where the testimony is blatantly false and pertains to an issue central to the Commonwealth's case, a defendant's ability to discern the statement's falsity does not absolve prosecutors of their duty to correct. Cf. United States v. Stein, 846 F.3d 1135, 1147 (11th Cir.), cert. denied, --- U.S. ----, 138 S. Ct. 556, 199 L.Ed.2d 436 (2017) ("where the government not only fails to correct materially false testimony but also affirmatively capitalizes on it, the defendant's due process rights are violated despite the government's timely disclosure of evidence showing the falsity");
*37 Sivak v. Hardison, 658 F.3d 898, 909 (9th Cir. 2011), quoting Northern Mariana Islands v. Bowie, 243 F.3d 1109, 1122 (9th Cir. 2001) ("It is 'irrelevant' whether the defense knew about the false testimony and failed to object or cross-examine the witness, because defendants 'c[an]not waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the government to protect the integrity of the court and the criminal justice system' ").
Our cases cited supra are not inconsistent with this conclusion, as they do not address blatantly false testimony central to the prosecution's case. See Burgos, 462 Mass. at 60, 62, 965 N.E.2d 854 (prosecutor did not "knowingly and improperly fail[ ] to correct allegedly **726 false testimony" where defendant knew at trial about information that purportedly showed testimony was false, and where judge found "that it would have been reasonably clear to the jury that the witnesses were not suggesting" false information); Jewett, 442 Mass. at 363, 813 N.E.2d 452 (Commonwealth not required to impeach own witness with documents in defendant's possession that were supposedly inconsistent with witness testimony where documents were "cryptic and inconclusive"); Mercado, 383 Mass. at 525, 420 N.E.2d 330 (no misconduct where defendant knew at trial about information that allegedly showed testimony was false, and where information did not in fact show testimony was false); Heffernan, 350 Mass. at 54-55, 213 N.E.2d 399 (no error where defendant had "full knowledge" of pertinent facts and "prosecutor had no knowledge of there being anything amounting to perjury").
Here, the trooper's testimony about the second interview was blatantly false and pertained to a critical component of the Commonwealth's case. Thus, it was error for the prosecutor not to correct the testimony.[12] And because of its importance to the Commonwealth's case, the testimony "was likely to have influenced the jury's conclusion" and, thus, created a substantial likelihood of a miscarriage of justice. Commonwealth v. DiPadova, 460 Mass. 424, 437, 951 N.E.2d 891 (2011), quoting Commonwealth v. Berry, 457 Mass. 602, 618, 931 N.E.2d 972 (2010), S.C., 466 Mass. 763, 2 N.E.3d 177 (2014).
Proving the defendant's presence at or near the Dunkin' Donuts was a cornerstone of the Commonwealth's strategy at trial. The Commonwealth elicited testimony showing that the Dunkin' Donuts was a five-minute walk from the crime scene. The jurors later visited two locations during a view: the Dunkin' Donuts and the crime scene. During the view, the prosecutor twice asked the jurors to observe the properties next to the Dunkin' Donuts and the distance between the crime scene and the Dunkin' Donuts. Importantly, following the view there was testimony that three people jumped into a back yard abutting the Dunkin' Donuts after gunshots were heard on the night of the shooting. Considering this evidence, the trooper's testimony that the defendant had said he was picked up at or near the Dunkin' Donuts placed the defendant **727 near the scene of the crime and in the precise area where the shooter or shooters were seen fleeing.
The prosecutor solidified the impact of the trooper's testimony when she said in *38 closing argument that "[y]ou ... need presence at or near a crime scene in a murder case." She reminded jurors about the witness "who said they jumped the fence in her yard that backs right up to the Dunkin' Donuts parking lot, ... the one where ... Barros may or may not have picked up the defendant." Although the prosecutor acknowledged that the defendant was picked up "either at the Dunkin' Donuts, the area around the Dunkin'[ ] Donuts, ... or at the defendant's [home] address," the trooper's false testimony encouraged a finding that the defendant was picked up at or near the Dunkin' Donuts.
Any other evidence that the defendant was picked up there was tenuous at best. As discussed supra, the trooper testified, inconsistently with his police report, that during the defendant's first interview with police the defendant said he had been picked up in the area of Dunkin' Donuts. But the trooper contradicted his own testimony on cross-examination and adopted the information in his report, according to which the defendant said he was picked up at a friend's house.
The trooper also testified that Barros told the trooper he picked up the defendant "in the area of Dunkin' Donuts." However, immediately before this testimony the judge instructed the jury that testimony about out-of-court statements could be used only for impeachment. Earlier in the trial, Barros had testified that he did not remember telling the police he had picked up the defendant near Dunkin' Donuts. When asked where he did tell the police he had picked up the defendant, he responded, "I told them I picked him up somewhere around our house[s]." No substantive evidence supported the trooper's impeachment testimony that Barros had said he picked up the defendant near the Dunkin' Donuts.[13]
The jury did hear substantive evidence that the defendant was near the Dunkin' Donuts on the night of the shooting after Barros **728 picked him up at a different location. Barros testified that he and the defendant, while in Barros's vehicle, were stopped at a traffic light near the Dunkin' Donuts and saw a police car pass with flashing lights. And the trooper testified, consistently with a transcript of the second interview, that the defendant had told police that "when he was in [Barros]'s car in the area of Dunkin' Donuts, he had seen police cars going by with their lights on." Although inculpatory to some extent, evidence that the defendant was near the crime scene in a car after the shooting and after having been picked up elsewhere pales against evidence that the defendant was picked up near the crime scene. This is especially true considering the testimony that individuals jumped into a back yard next to the Dunkin' Donuts after the shooting.
Finally, although there was no instruction on consciousness of guilt, the jury may have perceived the false testimony that the defendant changed his story about where he was picked up as evidence of the defendant's guilty mind. See *39 Commonwealth v. Vick, 454 Mass. 418, 424, 910 N.E.2d 339 (2009), quoting Commonwealth v. Stuckich, 450 Mass. 449, 453, 879 N.E.2d 105 (2008) ("false statements to the police" may warrant consciousness of guilt instruction). Without the false testimony, the jury would have been less likely to believe that the defendant changed his story from being picked up at or near the Dunkin' Donuts to being picked up at his house. The only other substantive evidence that the defendant said he had been picked up at or near the Dunkin' Donuts would have come from the trooper's testimony about his first interview with the defendant, which the trooper contradicted when he adopted on cross-examination the statements in his police report about where the defendant had said he was picked up. Thus, absent the uncorrected false testimony, the only inconsistency about where the defendant said he had been picked up would have been the defendant saying during the first interview that he had been picked up at his friend's house and saying during the second interview that he had been picked up at his own house.[14] This discrepancy is less inculpatory than one involving the Dunkin' **729 Donuts, which the Commonwealth linked with the crime throughout trial.
The trooper's false testimony about the defendant's second interview with the police created a substantial likelihood of a miscarriage of justice. The false testimony went to "a central point in the trial as a whole," DiPadova, 460 Mass. at 437, 951 N.E.2d 891, and the case against the defendant, although considerable, was not quite strong enough to overcome the prejudice from the Commonwealth's erroneous elicitation of and failure to correct the false testimony. Cf. Commonwealth v. Cowels, 470 Mass. 607, 623, 24 N.E.3d 1034 (2015) ("over-all strength or weakness of the evidence presented against a defendant is significant ... because it provides the context within which to assess whether the newly discovered evidence would have been a real factor in the jury's deliberations").[15]
**730 *40 Conclusion. The error warranting reversal here goes to the heart of the Commonwealth's obligation to do justice. A prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.... It is as much his [or her] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).
The defendant's convictions are vacated and set aside. The case is remanded to the Superior Court for further proceedings consistent with this opinion.
So ordered.

The defendant also was convicted of two counts of armed assault with intent to murder, two counts of assault and battery by means of a dangerous weapon, and unlawful possession of a firearm.

Two police interviews with the defendant are relevant to this opinion. The first interview took place at the defendant's house on July 13, 2009, about three months after the shooting, and is described in a police report of State police Trooper Robert F. Clements, Jr.. The second interview took place at a police station on October 9, 2010, about one and one-half years after the shooting. A transcript and video recording of the second interview are in the record.

The trooper testified also, although not in so many words, that nobody except the defendant confessed to killing the victim. The defendant contends, and the motion judge found, that the trooper's statement was false because the trooper's police reports discuss other confessions. It is not always error for a prosecutor to elicit from a police officer testimony inconsistent with the officer's police report. See Commonwealth v. McLeod, 394 Mass. 727, 743, 477 N.E.2d 972, cert. denied sub nom. Aiello v. Massachusetts, 474 U.S. 919, 106 S.Ct. 248, 88 L.Ed.2d 256 (1985) ("Simply because a witness alters some portion of his testimony at the time of trial is not a sufficient reason to conclude that the new testimony is false, or that the Commonwealth knew or had reason to know that it was false"). Here, however, the judge found based on the police reports that informants told the trooper about confessions by individuals other than the defendant, and the Commonwealth concedes that the reports show the police knew about other confessions. Because the prosecutor was responsible for the contents of the trooper's police reports, cf. Commonwealth v. Murray, 461 Mass. 10, 19, 957 N.E.2d 1079 (2011) (prosecutor must disclose exculpatory evidence possessed by police officer who "acts as an agent of the government in the investigation and prosecution of the case"), the prosecutor erroneously elicited and failed to correct what she knew or should have known was false testimony about a lack of other confessions. We need not decide whether this error warrants reversal where the trooper's false testimony about the defendant's statements to police created a substantial likelihood of a miscarriage of justice.

Likewise, the victim's boyfriend testified that sometime after the night of the shooting, the defendant told him that "he didn't do it."

At trial, defense counsel did express concern that the trooper's testimony about the defendant's interviews was false, stating at sidebar, "I already found out about the picking him up at Dunkin' Donuts. My client didn't say that. So I'm going to impeach him ... with that." The judge deferred addressing the issue until after the trooper's direct examination. After the direct examination was completed, the judge asked to "see counsel again on that issue," and the defense attorney replied, "No, I'm all right. Thank you." Thus, the judge did not have an opportunity to address any claim that the Commonwealth had elicited or failed to correct false testimony. See Commonwealth v. McDonagh, 480 Mass. 131, 137 n.7, 102 N.E.3d 369 (2018) ("At least as important as protecting the record, a timely and precise objection provides the judge with an opportunity to consider the argument presented in order to make a reasoned decision").

The judge applied a different standard in his decision denying the defendant's motion for a new trial, namely, whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." Commonwealth v. Gilday, 382 Mass. 166, 177, 415 N.E.2d 797 (1980), quoting United States v. Agurs, 427 U.S. 97, 103 & n.9, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Because the "any reasonable likelihood" standard is a matter of due process, see Gilday, supra, the "substantial likelihood" standard may not provide less protection to defendants in this context. Cf. Commonwealth v. Urena, 417 Mass. 692, 696, 632 N.E.2d 1200 (1994) ("satisfaction of the standard for effective assistance of counsel under the [Massachusetts] Declaration of Rights ... satisfies the Federal standard").

A map in evidence shows that Winthrop Street is no closer to the crime scene than the defendant's house, which according to the trooper's testimony is approximately two miles from the crime scene.

The trooper testified that the second story the defendant told during the first interview was that he went to the house of the friend who had sent him "instant messages" from the baby shower.

The judge discussed the second interview only in the context of the defendant's claim of ineffective assistance of counsel, concluding that defense counsel was not ineffective for failing to cross-examine the trooper about the second interview.

The defendant stated during the second interview that he lives "right up the street from ... Dunkin' Donuts." However, this statement does not make correct the trooper's false testimony that the defendant had said he was picked up "in the area of Dunkin' Donuts." First, according to the trooper's testimony the defendant's house is approximately two miles from the Dunkin' Donuts. Second, the trooper testified that the defendant had two explanations for where he was picked up: in the area of Dunkin' Donuts and at his house. The trooper clearly was not referring to the defendant's house when he said that the defendant had stated he was picked up in the area of Dunkin' Donuts.

The interviews with the defendant were the subject of a motion to suppress, and at the hearing on that motion the judge was provided with a transcript of the second interview. At trial, the prosecutor said at sidebar that she "provided these transcripts to [defense counsel] several weeks ago, prior to the motion to suppress."

The Commonwealth argues that any false testimony was corrected when the prosecutor asked the trooper why the defendant "was thinking of the Dunkin' Donuts," and the trooper replied that the defendant had stated that "when he was in [Barros]'s car in the area of Dunkin' Donuts, he had seen police cars going by with their lights on." However, this testimony served to explain an inconsistency that never existed. It did not correct the trooper's false testimony.

The defendant claims it is false that Barros told the police he picked up the defendant near the Dunkin' Donuts. The judge rejected this argument, observing that "[t]he defendant offers no evidence that th[e] testimony was false." As indicated in the text, Barros testified that he had told the police that he picked up the defendant "somewhere around our house[s]," and the trooper testified that Barros had told the police that he picked up the defendant "in the area of Dunkin' Donuts." However, inconsistent testimony is insufficient to put a prosecutor on notice that a particular witness's story is false. See Commonwealth v. Sullivan, 410 Mass. 521, 531-532, 574 N.E.2d 966 (1991), S.C., 469 Mass. 340, 14 N.E.3d 205 (2014).

The trooper testified about an inconsistency in the defendant's statements unrelated to where Barros picked up the defendant. According to the trooper, during the first interview the defendant "stated that he ... took a cab from [Wells]'s house ... to his father's house .... He then changed that when I confronted him with the cab records, which indicated that he had actually taken a cab from Hillberg to his dad's." This testimony is consistent with the police report describing the interview, as well as testimony at trial about taxicab records from the morning after the shooting.

Because we are ordering a new trial, we do not address fully certain other claims the defendant raises on appeal, including his request that we exercise our power under G. L. c. 278, § 33E. However, with respect to the contention that various statements in the Commonwealth's closing argument were improper, the Commonwealth should use caution when paraphrasing the defendant's statements, be certain that any reference to a "murder weapon" is grounded in the evidence about what type of bullet killed the victim, avoid asking jurors to put themselves into the case, and, as always, characterize the law accurately.
With respect to the defendant's various arguments about cell site location information (CSLI), we observe that if defense counsel was provided with CSLI during discovery, then he was constitutionally ineffective for failing to recognize the existence of that information, assuming none existed, and then raising the issue on cross-examination of the trooper by asking, "You didn't map out anything regarding ... where [the defendant] was on April 25, 2009, did you?" to which the trooper replied, "Yes, we did." We observe also that, according to the defendant, the Commonwealth did not comply with a discovery order to turn over CSLI mapping. In his decision denying the defendant's motion for a new trial, the judge rejected this argument because "a large number of records from cell phone companies were obtained during grand jury proceedings and provided to the defense." If requested CSLI mapping exists, then the Commonwealth is obligated to provide it to the defendant at a new trial.
Finally, with respect to the defendant's various arguments about third-party culprit evidence in the form of instant messages, we need not unravel the thicket of this evidentiary and discovery dispute, as "[t]he defense now has the relevant information and counsel can adequately assert the defendant's rights at any retrial." Commonwealth v. Connor, 392 Mass. 838, 852, 467 N.E.2d 1340 (1984). Nevertheless, we provide some general guidance. As the judge recognized implicitly, the defendant is required as a foundational matter to authenticate the instant messages. Authentication is an issue of conditional relevance. See Mass. G. Evid. § 104(b) (2019). See generally Mass. G. Evid. §§ 901, 902 (authentication). A judge, when addressing an issue of conditional relevance, does not decide whether he or she believes that the item being offered in evidence is what it is purported to be. Rather, the judge decides whether a trier of fact "could reasonably find the conditional fact ... by a preponderance of the evidence." Commonwealth v. Meola, 95 Mass. App. Ct. 303, 308 n.13, 125 N.E.3d 103 (2019), quoting Huddleston v. United States, 485 U.S. 681, 690, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). The judge is not making a credibility decision when addressing conditional relevance. For that, we put our faith in the jury. This circumstance is in contrast to that of the judge addressing preliminary questions of fact upon which admissibility depends. See Mass. G. Evid. § 104(a). With respect to those questions, the judge decides whether a foundational issue of evidentiary law has been satisfied in determining the admissibility of evidence. See, e.g., Mass. G. Evid. § 804(a) (unavailability of out-of-court declarant for purposes of certain hearsay exceptions); Mass. G. Evid. § 803(2) (spontaneous utterance exception to rule against hearsay); Mass. G. Evid. § 702 (reliability of expert witness testimony); Mass. G. Evid. art. V (privileges).